**DISTRICT OF COLUMBIA,**
Appellant/Cross–
Appellee,

v.

**Natalie Love HAWKINS, et al., Appellees/Cross–
Appellants.**

**Nos. 96–CV–218, 96–CV–484, 96–CV–525, 96–CV553.**

District of Columbia Court of Appeals.

Argued April 13, 1999.

Decided Oct. 4, 2001.

Donna M. Murasky, Assistant Corporation Counsel, with whom Jo Anne Robinson, Principal Deputy Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for appellant/cross-appellee.

Patrick M. Regan, with whom Jonathan E. Halperin, Victor E. Long, and Paul M. Higgins, were on the brief, Washington, DC, for appellees/cross-appellants.

Before WAGNER, Chief Judge, and STEADMAN, Associate Judge, and KERN, Senior Judge.

WAGNER, Chief Judge:

At issue in these consolidated appeals is whether appellant, the District of Columbia, is liable for the deaths of the driver and a passenger in a motor vehicle which was struck by the driver of another vehicle who was being pursued in a high speed chase by police officers of the District of Columbia Metropolitan Police Department (MPD). Donna Love, who was driving, and her seven year old nephew, James Gripper, Jr., were killed in the accident. Appellees, Natalie Love Hawkins, individually and as personal representative of the Estate of James Bernell Gripper, Jr. and Reginald Lamont Dease, individually and as personal representative of the Estate of Donna Love, brought the actions under the District of Columbia Wrongful Death Act (D.C.Code § 16–2701) (2001)and the District of Columbia Survival Act (D.C.Code § 12–101) (2001).[1] A jury awarded damages on behalf of appellees in the total amount of $5,997,751.77. The trial court denied the District's post trial motion for judgment notwithstanding the verdict, concluding that the evidence supported the finding that the police officers' conduct constituted gross negligence.[2] The trial court granted, in part, the District's motion for remittitur, ordering appellees to remit the sum of $3,772,153.00. This resulted in a judgment of $753,169.61 to Natalie Love Hawkins as mother and personal representative of the estate of James Gripper, Jr., $160,000.00 individually to

---

1. Myron Harley, Sr., the father of Ms. Love's two surviving children, Myron Harley, Jr. and Sandy Harley, was also a nominal plaintiff in the trial court. However, suits under the Wrongful Death and Survival Acts are enforceable by the legal representative of the decedent's estate, and the survivor's interest is recoverable by the personal representative. See Strother v. District of Columbia, 372 A.2d 1291, 1295 (D.C.1977). Harley noted an appeal with respect to the trial court's order granting remittitur, but did not file a brief.

The estate dismissed the cross appeal of the trial court's remittitur order, and we dismiss Harley's separate appeal.

2. Although concluding that the negligent training claim was improperly submitted to the jury on a simple negligence theory, the trial court ultimately stated that it was unnecessary to resolve the issue, having found for appellees on the gross negligence theory.

Reginald Lamont Dease as husband of Donna Love, $702,529.16 to Reginald Lamont Dease as personal representative of the estate of Donna Love, and $609,900.00 to Myron Harley, Sr. as father and legal guardian of Myron Harley, Jr. and Sandy Harley. The District appealed from the denial of its motion for judgment as a matter of law. Appellees cross appealed from the order granting remittitur; however, they dismissed the cross appeal when they filed their brief. The District argues for reversal on the grounds that: (1) the evidence did not establish that its police officers were grossly negligent in conducting the high speed chase; (2) it was error to submit the claim of negligent training to the jury under an ordinary negligence standard, and gross negligence was not shown; and (3) it was plain error to allow damages for loss of maternal services, which is parent-child consortium, and not allowed in this jurisdiction; and (4) the damages for pain, suffering and pre-death mental anguish are excessive. We hold that a reasonable juror could find from the evidence that the MPD officers' gross negligence caused the accident and that there is no basis for reversing the damages award. Therefore, we affirm.

## I.

## The Evidence

### A. *The High Speed Chase*

On May 7, 1991, at about 6:00 p.m., Joseph Brooks saw a Nissan Pathfinder hit a pedestrian near the 300 block of Ridge Road, S.E. and drive away. Brooks called to bystanders to alert the police. Almost immediately, a citizen reported the hit and run accident to Officers Thomas Lee and Norman Power, who were in the area in Scout Car 50. Officer Lee, who was driving, activated his vehicle's lights and sirens and tried to pull the Pathfinder over. The driver of the Pathfinder made a left turn onto 37th Street, turned on Ely Place, S.E., and proceeded toward Minnesota Avenue, S.E. As the Pathfinder made the turn onto Ely Place, a passenger jumped out of the vehicle. While on Ely Place, the Pathfinder traveled at increasing speeds, ranging from 50 miles per hour to 90 miles per hour. Donna Love was driving a Dodge Colt that day, and her seven year old nephew, James Gripper, Jr., was with her. Ms. Love was traveling north on Minnesota Avenue through the intersection of Ely Place when the Pathfinder entered the intersection and struck Ms. Love's car. Ms. Love was thrown from the car, and both she and her nephew died at the scene as a result of their injuries.

The speed limit in the area was 25 miles per hour. There was testimony that there is an incline on Ely Place about 300 hundred feet before it reaches Minnesota Avenue which prevents a motorist from seeing the intersection at Minnesota Avenue and Ely Place. There was evidence that there was a pre-school building located in the area where the pursuit began and that 37th Street is a residential area with private homes and multi-unit apartment buildings. Sousa Junior High School is at 37th Street and Ely Place, and an elementary school is at Ely Place and Minnesota Avenue, according to the evidence. Officer Lee, the driver of the lead police car, testified that he was familiar with the area and knew that it was residential, with schools and day care centers. Officer Norman Power testified that both he and Officer Lee knew that there was traffic at the intersection of Minnesota Avenue and Ely Place and that it was rush hour. Officer Power also testified that vehicle pursuits should be called off when the speed becomes excessive and that 70, 80 and 90 miles per hour during rush hour is excessive. He estimated the Pathfinder's speed

at 80 miles per hour immediately before the collision. Officer Lee testified that he slammed on his brakes when he saw the red light and to avoid colliding with the Pathfinder. Officer Lee said that he did not come to a stop until he was in the intersection.

Officer Stringer and his partner, Officer Marable, were in Scout Car 51, pursuing behind Scout Car 50. Officer Marable, who was driving, testified that he also knew the neighborhood was residential, that there were schools and a day care center in the area, and that it was rush hour. He testified that he knew by the time the Pathfinder reached 37th Street and Ridge Road that it would not stop. He also testified that a vehicle pursuit at 70, 80, 90 or 100 miles per hour is not appropriate in a residential neighborhood during rush hour when there is heavy vehicular and pedestrian traffic.

Several civilians, who witnessed the chase and collision, testified at trial. One witness, Matthew Shealey, who was stopped for a light at Ely Place, estimated the speed of the Pathfinder and police cars at 80 to 90 miles per hour as they traveled down Ely Place. He said that the lead police car was close behind the Pathfinder, as close as "bumper-to-bumper." Shealey described traffic conditions as heavy, and he said there were pedestrians all over the area. David Proctor, who was sitting on his porch in the area of Ely Place and Anacostia Road, testified that he saw a white Pathfinder pass his home at an estimated speed of 80 miles per hour with police cars following two car lengths or so behind the Pathfinder. Proctor testified that the first police car was 30 to 35 feet from the Pathfinder when it braked just prior to the impact. Shealey's passenger, Lawrence Jones, estimated the speeds at 75 to 80 miles per hour. However, he estimated that there were three to five car lengths between the police car and the Pathfinder. Carlton Bradshaw, who was standing at a bus stop at the corner of Minnesota Avenue and Ely Place, testified that the Pathfinder's speed was 90 miles per hour as it came into the intersection with the police vehicles following directly behind it with their lights and sirens on. He testified that he saw the Pathfinder drive over the Dodge Colt, fly through the air, flip on its top and come to a stop behind the Colt. He saw Ms. Love ejected from the Dodge Colt "like a cork pop[ing] out of a champagne bottle." He observed a young man comforting the little boy who remained in the vehicle and holding his hand. Kenny Pickeral testified that he was in front of his house in the 100 block of 34th Street, heard the sirens and saw the Pathfinder hit the Colt and the police cars right behind the Pathfinder in the intersection. Bruce Wilson, who lived two blocks from the intersection where the accident occurred, saw the two police cars chasing the Pathfinder at a speed between 70 to 80 miles per hour. He testified that before they reached the hill, the first police car was no more than two car lengths behind the Pathfinder.

### B. *Expert Testimony*

Appellees called three witnesses who offered expert testimony concerning the accident: George Little, an accident reconstructionist; Dr. George Kirkham, an expert in police policies, practices, standards and procedures; and Robert Klotz, a former MPD officer with expertise in police practices, policies, procedure and training. Little, an accident reconstructionist for over fifteen years, testified that the minimum speed of the Pathfinder was 83 miles per hour, but it could have been as much as 85 to 90 miles per hour. Little conceded, however, that if the police car was travelling less than a car length

behind the Pathfinder at the same speed it could not avoid hitting the first car.

In Dr. Kirkham's expert opinion, the pursuit by the police officers was an extreme violation of nationally accepted law enforcement standards and procedures.[3] He testified that a law enforcement officer is supposed to weigh the seriousness of an offense and the urgency of making an immediate apprehension of a suspect in a vehicular pursuit against the foreseeability of the risk of danger of death or injury to innocent persons. Kirkham testified that the officers should have considered the area as being residential, that there was an intersection controlled by a signal light ahead, the time of day—between 6:00 and 6:15 p.m.—and the actions of the suspect's vehicle.

Robert Klotz testified that he is a retired deputy chief of the MPD and consults on police practices. He spent six years patrolling the area of the collision. In Klotz's expert opinion, there is a national standard of care for police conduct during a hot pursuit, and the officers did not meet the applicable standard of care and were grossly negligent. Klotz was of the opinion that the officers in this chase were "pushing" the Pathfinder and mimicking the driver's actions instead of just trying to keep him in sight. He testified that by maintaining the same speed as the Pathfinder, they were as much of a danger to other vehicles and pedestrians on the street as the car they were chasing. Klotz testified that once the officers knew the Pathfinder would not stop, his rate of speed, location, time of day and other cir-

cumstances, they should have notified the dispatcher and discontinued the chase.

Gilbert Smith testified that he has been a vehicle skills instructor with the MPD for seven years and has been with the police department for twenty-four years. He testified that he taught a course on emergency pursuit driving procedures. He testified that police officers are taught that the chase can be discontinued at speeds of 50 miles per hour or more "depending on the circumstances of the traffic, congestion, or pedestrians, or weather conditions." Smith testified that all police officers are given a copy of the Metropolitan Police Department General Order 301 which sets out the considerations for deciding whether to start or stop a chase. The officers were required to study the Order which lists among the factors for consideration: speed of the chase, weather conditions, mechanical handling of the vehicle, reason for the pursuit and risk to the officer and other citizens.

Joseph Dodson, Jr. testified that he is the supervisor of the Vehicle Skills Unit of the training division and has been a sergeant with the MPD for twenty-three years. Dodson testified that in 1990 and 1991 there was a sixteen week training academy for new recruits of the police department and in those sixteen weeks a forty hour course is devoted to vehicle skills. Dodson testified that a course titled "Vehicle Pursuit" entailed approximately "15 to 20 minutes" of training each officer in high speed pursuits. In a prior deposition, Dodson stated that there was

---

**3.** Dr. Kirkham, testified that he is a professor emeritus at Florida State University in criminology and criminal justice as well as a private criminal justice consultant. Kirkham has been involved in serving as a trainer, lecturer and consultant to "some" 50 different law enforcement agencies in the United States and "in addition to books and written materials 'Kirkham' authored some twenty-three training films and videotape accompanying manuals" that are widely used by police officers throughout the nation. He took a leave of absence in 1971 from his university post to work as a uniformed patrol officer which he continued to do until 1991.

no specific training for pursuits. He also testified that "hopefully, by the time they get to us, [the new recruits] have already been taught 301.3" and should already know when to discontinue a pursuit.

## II.

### Gross Negligence Theory

#### A. *Applicable Legal Principles*

▮▮▮▮ "The District of Columbia cannot be held liable for claims arising out of the operation of a police car on an emergency run unless the officer driving the car acted with gross negligence." *District of Columbia v. Henderson,* 710 A.2d 874, 876 (D.C.1998); *see also* D.C.Code § 2–411 (2001). D.C.Code § 2–411 (2001) (4) defines "emergency run," in pertinent part, as

> the movement of a District-owned vehicle, by direction of the operator or of some other authorized person ..., under circumstances which lead the operator ... to believe that such vehicle should proceed expeditiously upon a particular mission ... for the purpose of dealing with a supposed ... emergency, an alleged violation of a statute or regulation....

In the context of this statute, we have defined "gross negligence" to require "such an extreme deviation from the ordinary standard of care as to support a finding of wanton, willful and reckless disregard or conscious indifference for the rights and safety of others." *District of Columbia v. Walker,* 689 A.2d 40, 44 (D.C. 1997). It includes conduct so extreme as to connote some sort of bad faith. *Id.* (citing *Andrews v. Wilkins,* 934 F.2d 1267, 1272 (D.C.Cir.1991)). However, when evidence of the actor's subjective bad faith is not present, "the extreme nature of the conduct may be shown by demonstrating that the actor acted in disregard of a risk

'so obvious that [the actor] must be taken to be aware of it and so great as to make it highly probable that harm would follow.'" *Id.* at 44–45 (quoting 3 S. SPEISER, *et al.,* THE AMERICAN LAW OF TORTS § 10.2, at 361 (1986)). Among the factors which courts consider in determining whether the conduct of a person involved in a police chase amounts to gross negligence are: (1) the length of the chase; (2) the type of neighborhood; (3) the characteristics of the street or roadways; (4) the presence of vehicular or pedestrian traffic; (5) weather conditions and visibility; and (6) the seriousness of the offense for which the police are pursuing the offender. *Id.* at 45 (quoting *Peak v. Ratliff,* 185 W.Va. 548, 556, 408 S.E.2d 300, 308 (1991)). However, the primary focus must be not upon the conduct in all its aspects, but rather upon that particular conduct that might be said temporally and spatially to have proximately caused the collision. *Id.* at 46.

#### B. *Analysis*

The District argues that the evidence establishes as a matter of law that the police officers were not grossly negligent. In support of its argument, the District relies principally upon this court's decision in *Walker, supra.* In *Walker,* this court held that the police were not grossly negligent in continuing to chase an underage driver in a stolen vehicle through red lights onto a parkway, where they reached speeds of approximately 90 miles per hour. *Walker,* 689 A.2d at 43, 47–48. Shortly before the actual collision, the Prince George's police car entered the chase, pulling in between the cars of the District's police officers and the fleeing suspect, and the parkway changed from a four lane divided highway into a two lane road divided by a double yellow line. *Id.* at 43. The suspect pulled into the lane of oncoming traffic, passed three cars and

struck an oncoming vehicle.[4] Thus, immediately before the collision, "the police were faced with a driver proceeding down a divided limited access highway at a very high rate of speed where vehicular traffic was light, there were no pedestrians, and the conditions were clear and dry." *Id.* at 47. Although this court also recognized the presence of factors which suggested that continuing the pursuit might not be appropriate, it determined that it could not conclude that the relevant conduct which resulted in the collision was such an extreme deviation from the reasonable standard of care as to amount to gross negligence on the part of the District police. *Id.* at 47–48. The decision in *Walker* is instructive both in defining gross negligence in the context of a claim arising out of the operation of a police car on an emergency run and in identifying and applying the factors for consideration in making that determination. The court considered the same factors which other courts look to, such as the rate of speed, the traffic conditions, the weather conditions, and the absence of pedestrians, all of which the court found to weigh against a finding of gross negligence in *Walker*.

■ The facts in *Walker* differ from the facts in the present case in important respects. In this case, the chase occurred in a residential area of the city, where private homes and multi-unit apartment buildings and schools were located. All of the officers involved in the chase were familiar with the conditions of the neighborhood. The chase and ensuing accident happened during the rush hour, at a busy intersection for vehicular and pedestrian traffic. Officer Lee, who drove the first scout car, and his partner, Officer Power, testified that they knew that the intersection where the accident occurred would be crowded during that time of day. There was testimony that the Pathfinder's speed was 83 to 90 miles per hour as it entered the intersection with the police vehicles, with sirens and emergency lights activated, following directly behind it. Officer Lee testified that he did not come to a stop until he was in the intersection, after he slammed on the brakes, when he saw the red light and to avoid colliding with the Pathfinder.

Most importantly, as the police knew, the roadway (Ely Place) had a crest which obstructed the view of what was on the other side of the hill. Thus, as the trial court pointed out, the evidence showed that "these officers were driving at an excessively high rate of speed without knowing what faced them, or the Nissan Pathfinder they were pursuing, over the crest of the hill." The jury could reasonably find that all these circumstances establish more than simple negligence. *Cf. Henderson, supra,* 710 A.2d at 877.[5] The

---

4. The entire chase covered approximately five miles; however, the court held that the proper focus was on the chase on Suitland Parkway where the collision occurred, rather than the police actions and conditions which existed at earlier points. *Walker, supra,* 689 A.2d at 46. The reason for that focus is because "[a]llegations that the police officers acted in a grossly negligent manner in ways that did not, in the end, play a substantial part in bringing about the collision cannot form the basis for liability." *Id.*

5. In *Henderson,* this court held that officers who ran a red light and struck a car while responding to an emergency call were not grossly negligent. The factors identified which weighed against a finding of gross negligence included that the officer, who was driving the first of two police cars that struck the plaintiff's vehicle, crossed an intersection on a legitimate Code One emergency at only five to ten miles per hour above the speed limit, with his emergency lights flashing and sirens and high beams activated, and he applied his brakes when he entered the intersection. *Henderson,* 710 A.2d at 876. Observing

serious aggravating factors required in order for the police officers' conduct to meet the gross negligence standard can be found in the continuation of this high speed chase under conditions which the officers knew created an extreme danger to others with reckless indifference to the situation. *See id.*

■ While the need to apprehend the driver was more urgent in this case than in *Walker*,[6] it is only one factor to be balanced against others, including the hazards of the chase to people on the street. "[T]he appropriate inquiry is whether, given the balance of the factors in th[e] case, a reasonable juror could conclude that the conduct of the [police] officers so grossly deviated from the conduct required under the circumstances as to support a finding of wanton, willful and reckless disregard or conscious indifference for the rights and safety of others." 689 A.2d at 46. While the standard for a finding of gross negligence in this context is a high one, we think that a reasonable juror could make that finding on the evidence presented.

■ The District argues that the police officers violated no law in the course of the pursuit and were attempting to protect the public safety. It contends that the conduct of the police here was consistent with standard techniques used to stop the driver of a vehicle who is suspected of having committed a crime. In the course of a vehicle pursuit to apprehend a criminal offender, a police officer may exceed the speed limit and ignore traffic lights.

*Henderson, supra,* 710 A.2d at 877 (citing 18 DCMR §§ 2002.2(b) and (c) and MPD General Order 301.3(1)(B)(5)). In doing so, however, the officer may not exceed rational bounds or act with gross negligence without being subject to liability. *See* D.C.Code § 2–412 (2001) (sanctioning the District's liability for gross negligence in operating an emergency vehicle). The conduct here, the jury might reasonably conclude, exceeded those bounds. Appellees' expert witnesses provided additional evidence bearing on the police conduct in this case. Both Dr. Kirkham and former Deputy Police Chief Klotz testified that the national standard of care required that a chase be discontinued where the circumstances presented an unnecessary risk to the safety of others. Dr. Kirkham testified that the standard of care requires the officer to weigh the urgency of immediate apprehension against the foreseeable risk to others. This standard, according to Dr. Kirkham, is consistent with the MPD General Order 301.3, which requires that the officer consider the vehicular and pedestrian traffic and the time of day, and the actions of the vehicle being chased. Dr. Kirkham testified that the conduct of the officers here represented an extremely serious violation of the nationally accepted law enforcement standards and procedures. He testified that following the Pathfinder closely at a high rate of speed acted as "a catalyst" which caused the Pathfinder to continue to travel at a high speed, thereby contributing to causing the

---

that a gross negligence standard demands serious aggravating factors to distinguish it from simple negligence, the court found that the officers in *Henderson* acted with relative prudence. *Id.* at 877. While acknowledging that the roadway was rain slick and that it was getting dark, this court concluded that such conditions were "garden variety considerations that are needed to establish *simple* negligence in the first place" and are insufficient to support a finding of gross negligence.

*Id.* (emphasis added). In *Henderson*, the police chase was at 5 or 10 miles per hour above the speed limit and differs significantly from the present case where there was evidence of speeds in a heavily trafficked area at 65 miles per hour above the limit.

6. The Pathfinder was reported to have been involved in a hit and run accident.

collision. Klotz concluded that it was grossly negligent and reckless to continue the chase under the circumstances. He cited specifically the chase over nearly a mile of city streets in a densely populated urban neighborhood, near schools and into an intersection known to be crowded during rush hour. Each of the drivers of the police vehicles was familiar with the conditions which created the hazard and continued the chase at exceptionally high rates of speed. Viewing the evidence in the light most favorable to appellees, as we must, we cannot say that no reasonable juror could have found that the police officer's conduct was grossly negligent in this case. *See Henderson, supra,* 710 A.2d at 875 (citing *Walker, supra,* 689 A.2d at 42) (other citation omitted).[7]

## III.

### Damages

#### A. *Loss of Maternal Services*

 The District argues, that assuming liability was established in this case, it was plain error for the court to permit the jury to award Donna Love's children damages for loss of maternal services. The District contends that loss of maternal services is synonymous with parent-child consortium for which recovery is precluded in the District of Columbia under *District of Columbia v. Howell,* 607 A.2d 501 (D.C.1992).[8] In *Howell,* adhering to past precedent,[9] we held that a child's parents could not recover for the loss of

parent-child consortium in an action for damages arising out of an accident in which the child was injured. *Id.* at 506. The claim in the case before us, however, arises under the Wrongful Death Act, D.C.Code § 16–2701 (2001). That Act creates a right in favor of the spouse and next of kin of a deceased person for damages arising out of a negligent act causing death. *Id.* "It is designed to provide a remedy whereby close relatives of the deceased who might have expected maintenance or assistance from the deceased had he lived, may recover compensation from the wrongdoer commensurate with the loss sustained." *Semler v. Psychiatric Inst. of Washington, D.C.,* 188 U.S.App. D.C. 41, 43–44, 575 F.2d 922, 924–25 (D.C.Cir.1978). In addition to allowing recovery for pecuniary losses resulting from the loss of financial support the decedent could have been expected to provide his next of kin, recovery is allowed for the value of services the decedent would have provided, including *e.g.,* loss of care, education, training, guidance and personal advice. *See Doe v. Binker,* 492 A.2d 857, 863 (D.C. 1985); *see also* STANDARDIZED CIVIL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 14–5, p. 265 (Rev.1998) (In a wrongful death action, the jury should "set a dollar amount on the reasonable value of any services that the deceased would have provided to each beneficiary over their joint life expectancies."). There was no plain error here in allowing recovery for the loss of decedent's services.[10]

---

7. We do not consider the District to be challenging the finding of proximate cause in this case. In light of our disposition finding that liability on a gross negligence theory was established, we need not address the District's argument related to the negligent training theory.

8. The District does not challenge the award for the loss of household services, which the trial court reduced to $109,000.

9. *See Pleasant v. Washington Sand & Gravel Co.,* 104 U.S.App. D.C. 374, 375, 262 F.2d 471, 472 (1958).

10. We perceive no basis to conclude, as the District suggests, that the award was based on the value of companionship.

## B. *Damages for Pain and Suffering*

Finally, the District argues that the reduced awards of $500,000 to James Gripper, Jr., and $350,000 to Donna Love for pain and suffering and pre-death mental anguish are still excessive. It contends that the child, James Gripper, Jr., experienced conscious pain and suffering for only two to five minutes and that Donna Love suffered consciously for only a few seconds, or "less than a minute," according to the medical expert, Dr. Brownlee. The District contends that a proper award cannot exceed $5,000 each. Appellees respond that: (1) the District has not demonstrated how the trial court abused its discretion in granting the remittitur; and (2) verdicts should not be measured strictly on a comparative basis.

The jury awards for these elements of damages were $1,500,000 for the estate of James Gripper, Jr. and $1,000,000 for the estate of Donna Love. In remitting these parts of the verdict, the trial court considered that the evidence established that James Gripper, Jr. probably suffered conscious pain and suffering for two to five minutes and that the duration of Ms. Love's pain and suffering was somewhat less. The court observed in a footnote that the expert witness, Dr. Brownlee had testified that Ms. Love's spinal cord was severed upon landing on the concrete after ejection from the vehicle, and that although she would have experienced some conscious pain and suffering even after the spinal cord had been severed, he concluded that it would have been for less than a minute. The trial court substantially granted remittitur for both awards, concluding that the amounts that it set were the highest reasonable sums the jury could have awarded for pain, suffering and pre-death mental anguish. In so ruling the trial court stated that it

> has been mindful and attentive to the view that comparing verdicts in other cases is not talismanic and controlling. This Court has noted and has attempted to heed the admonition in *Capitol Hill Hosp. v. Jones,* 532 A.2d 89 (D.C.1987) that "verdicts should not be measured strictly on a comparative basis." *Id.* at 93.

The grant of a new trial for an excessive award of damages will be reversed only when the amount of the award exceeds the maximum limit of a reasonable range within which the jury could find. *Vassiliades v. Garfinckel's, Brooks Bros.,* 492 A.2d 580, 594 (D.C.1985) (citation omitted). Whether to grant a new trial because of excessive damages is a matter within the discretion of the trial court. *Weinberg v. Johnson,* 518 A.2d 985, 994 (D.C.1986). We accord great deference to the trial court's decision in this regard, and we will reverse only for an abuse of discretion. *Finkelstein v. District of Columbia,* 593 A.2d 591, 596 (D.C.1991) (en banc) (citing *Louison v. Crockett,* 546 A.2d 400, 403 (D.C.1988)) (other citation omitted). The same is the case where the trial court, in its discretion, "might have chosen the lesser remedy of a new trial conditioned on plaintiff's declining to accept a remittitur."[11] *Id.* at n. 8 (citing *Munsey v. Safeway Stores,* 65 A.2d 598, 600 (D.C.1949)). There must be support in the record for the court's decision. *See id.* (citing *Lacy v. District of Columbia,* 408 A.2d 985, 988 (D.C.1979), *aff'd on reh'g,* 424 A.2d 317 (D.C.1980)). Only where the verdict is so excessive as to shock the conscience will a substantial remittitur or new trial be warranted. Applying that standard we con-

**11.** In the present case, the trial court remitted the verdict or alternatively granted a new trial. Appellees accepted the remittitur.

 

sider the District's argument that the trial court erred in not reducing the award for pain and suffering and pre-death mental anguish further.

 The District relies on this court's decision in *Finkelstein, supra,* where this court affirmed the trial court's decision finding a composite verdict of $1,030,002 excessive where the pecuniary loss was only $50,000 to $62,000 and the remainder had to be for pain and suffering of less than two and one-quarter hours. *Id.* at 596. The District points out that the awards here, where the suffering lasted from two to five minutes, are proportionately greater than those in *Finkelstein* and should therefore be reduced to an amount not to exceed $5,000.00. *See also Jones v. Wittenberg Univ.,* 534 F.2d 1203 (6th Cir. 1976). While reference to other awards may be helpful, in the end "excessive verdicts should not be measured strictly on a comparative basis." *Capitol Hill Hosp., supra,* 532 A.2d at 93. The trial court must determine whether "on the totality of facts before it whether [the damage award] was the result of passion, prejudice, or mistake." *Id.* (quoting *May Dep't Stores v. Devercelli,* 314 A.2d 767, 775 (D.C.1973)). When we determine whether the standard has been met for an excessive verdict, we must examine the extent and nature of the damages proved by the evidence. *See Weinberg v. Johnson,* 518 A.2d 985, 994 (D.C.1986).

In this case, in addition to Dr. Brownlee's testimony, there was testimony of an eyewitness who observed the victims at the scene of the accident. Carlos McCain testified that Ms. Love was still alive when he went over to her after she was thrown out of the car and that she appeared to be in "a lot of pain." He testified that "she was moaning." He said that it was within minutes before he went to check on the child. He found him "moaning" and in pain. He remained with the child for four or five minutes during which time he was alive, and he tried to reassure him. The witness testified that both victims were alive for ten to twenty minutes.[12] Our review of the evidence in the record does not persuade us that the trial court abused its discretion in not further reducing the verdict for pain and suffering and pre-death mental anguish. The amount remaining after remittitur does not shock the conscience or exceed the limits within which the jury could operate. *See Vassiliades, supra,* 492 A.2d at 594.

For the foregoing reasons, the judgment of the trial court hereby is

*Affirmed.*

---

**12.** McCain testified that he was a psychiatric counselor at Womack Army Medical Center, that his training included medical training and his level of training was equivalent to a licensed practical nurse.