# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2004-CA-00123-SCT

*THE CITY OF ELLISVILLE, MISSISSIPPI, AND*
*MICHAEL TOLBERT, INDIVIDUALLY AND IN HIS*
*OFFICIAL CAPACITY*

**v.**

*TAMMY W. RICHARDSON, RONNIE RICHARDSON*
*AND SHANA RICHARDSON, A MINOR BY AND*
*THROUGH HER MOTHER AND NATURAL*
*FRIEND, TAMMY W. RICHARDSON*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/31/2003 |
| TRIAL JUDGE: | HON. ROBERT LOUIS GOZA, JR. |
| COURT FROM WHICH APPEALED: | JONES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | HAROLD WAITS MELVIN |
| | PATRICIA FRANCINE MELVIN |
| ATTORNEY FOR APPELLEES: | EDWIN L. BEAN |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED IN PART AND REVERSED AND REMANDED IN PART - 04/28/2005 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1. In this case under the Tort Claims Act, Miss. Code Ann. §§ 11-46-1 to -23 (Rev. 2002 & Supp. 2004), a city and its police officer appeal from a judgment against them for damages where the plaintiffs were injured when their truck was struck by a vehicle driven by a third party who was pursued by the officer. We affirm in part and reverse and remand in part.

## FACTS AND PROCEEDINGS

¶2.     Around dusk on December 21, 1999, officer Michael Tolbert of the City of Ellisville police department was on patrol when he spotted Joe C. Evans, Jr., driving a vehicle in the opposite direction.  Aware of outstanding warrants for Evans, Tolbert made a u-turn, activated his blue lights and siren, and pursued Evans.  Evans proceeded to leave the city limits of Ellisville, while heading northbound on Highway 29, with officer Tolbert in pursuit.

¶3.     Tammy W. Richardson was also driving northbound on Highway 29.  As she began to make a left hand turn into a residential driveway crossing the southbound lane of Highway 29, Evans crashed into her while passing other northbound traffic.  In the car with Tammy was her minor daughter, Shana.

¶4.     Tammy was transported first to South Central Regional Medical Center in Laurel, and then to Forrest General Hospital in Hattiesburg, where she was admitted for six days, and then discharged.  She was soon readmitted for three additional days.

¶5.     Tammy, her husband Ronnie, and Shana, filed this suit against the City of Ellisville, and officer Tolbert, individually, and in his official capacity.

¶6.     Defendants filed their answer denying liability and raising as affirmative defenses: (1) the City is not liable to the Plaintiffs by reason of governmental immunity and (2) Tolbert is not liable to the Plaintiffs by reason of qualified immunity - performing police duties, in the scope of his employment.  Following Circuit Judge Billy J. Landrum's recusal, Judge Robert L. Goza was specially appointed to hear the case which was set for a bench trial by agreed order.

¶7.   At trial, Tolbert testified he began working for the Ellisville Police Department in November of 1998.   Although he never received training for "hot" pursuits, he was trained in high speed vehicle driving, and he had studied the department's pursuit policy.

¶8.   Tolbert testified regarding Evans's history with local law enforcement prior to the accident.   Approximately one month before the accident, on November 17, 1999, he sought to execute an arrest warrant on Evans at Evans's residence at which time Evans started a fight with officer Tolbert and another officer.   During the fight, Evans bit Tolbert and fled the scene. Tolbert filed charges against Evans for assaulting an officer.    At the time of the pursuit, there were outstanding warrants for Evans's arrest.

¶9.   Officer Tolbert testified that he saw Evans at an intersection.Tolbert made a u-turn and turned on his lights and then his siren as the chase began.  Tolbert testified:

> Q.  As you pursued Evans's vehicle northbound on Highway 29 were there any vehicles that got in between you and Mr. Evans's vehicle?
>
> A.  Yes, Sir.
>
> Q.  Can you tell the judge how many?
>
> A.  Five or six.
>
> Q.  Five or six?
>
> A.  Yes, sir.
>
> Q.  And what did those vehicles do?
>
> A.  They continued traveling north on 29.  I think there was one or two of them that pulled over and let me get around, but most of them didn't.  And he passed most of them.

Q.   As a matter of fact at the point of the collision. There were four vehicles between – behind Mrs. Richardson's vehicle after you turned on the highway. Would that be a fair statement?

A.  I believe it would be, yes sir.

Q.   And two you said pulled off on the right-hand shoulder and let you by them?

A.  I am guessing.   There were some that pulled over and it was about two of them.  I don't  remember exactly how many there was.  I don't remember exactly how many was between us.

Q.   Okay.  But suffice it to say, you didn't have a clear – it wasn't a clear line between you and Mr. Evans.  You had the blue lights on.  You had the siren on. There were vehicles in between.  He got vehicles in between you.  And you were still pursuing, right?

A.  Could you repeat the first part?

Q.  Yes, sir.  There wasn't a clear line between you and Mr. Evans because he got vehicles in between you and him; is that correct?

A.  Yes, sir.

*     *     *     *

Q.   As you proceeded north, did you encounter other cars ahead of you in the northbound lanes of traffic?

A. Yes, sir.

Q. What did Mr. Evans do?

A. Passed them.

*     *     *     *

Q.   Officer Tolbert, why did you not go out into the northbound lane and follow Mr. Evans?

A.  There was on-coming vehicles.

Officer Tolbert also completed an Offense Form, dated December 21, 1999, which was introduced into evidence, that Evans was "running oncoming traffic off the road" and that the Evans's vehicle passed several vehicles before striking the truck on the side. Officer Tolbert also admitted that both he and Evans were exceeding the posted speed limit.

¶10. A witness, Bobby Reynolds, testified that he was standing out in his driveway at around 7:15 p.m., when he saw the police car go by with the lights on and the siren blowing. Reynolds stated that the accident occurred within 15 seconds from the time they passed his driveway. He was approximately 600 feet from the scene of the accident and heard, but did not see, the collision. Reynolds testified:

> the pickup truck was hit hard in the left, the driver's door, and right behind in the bed of the truck, the bed of the truck and the camper hull that was on the truck was laying across the top of the gas meter that was sitting those (sic) people's yard. The truck was sitting off in the ditch above the driveway that it was going to, and the other car was sitting in the ditch above the driveway.

¶11. Following trial, the trial court entered a Memorandum Opinion and Judgment, awarding $95,000.00 to Tammy, $2,500.00 to Shana, and $1,000.00 to Ronnie, against the City and Officer Tolbert.

¶12. Defendants properly perfected their appeal and raise the following issues:

    **I.**     **Whether finding of reckless disregard is contrary to the evidence.**

    **II.**     **Whether the trial court should apportion damages under Miss. Code Ann. § 85-5-7(7).**

    **III.**     **Whether damages were supported by medical proof in terms of probability.**

**ANALYSIS**

¶13. This Court has stated:

> The standard of review for a judgment entered following a bench trial is well settled. A circuit court judge sitting without a jury is accorded the same deference with regard to his findings as a chancellor, and his findings are safe on appeal where they are supported by substantial, credible, and reasonable evidence.

*City of Jackson v. Brister*, 838 So. 2d 274, 277-78 (Miss. 2003) (citations omitted). "This Court reviews errors of law, which include the proper application of the Mississippi Tort Claims Act, de novo." *Id.* (citation omitted).

## I. Reckless Disregard

¶14. This Court finds substantial, credible and reasonable evidence to support the trial court's finding of reckless disregard.

¶15. The trial judge, in his findings of facts and conclusions of law, determined the following:

> [I]mmunity afforded under the Mississippi Tort Claims Act . . . does not apply if the employee acted in reckless disregard for the safety and well-being of any person not engaged in criminal activity at the time of the injury. In *Johnson v. City of Cleveland*, 846 So. 2d 1031, 1037 (Miss. 2003), our Supreme Court enumerated 10 factors to support a finding of reckless disregard in connection with police pursuits as follows:
> 1. The length of the chase
> 2. Type of neighborhood;
> 3. Characteristics of the streets;
> 4. The presence of vehicular or pedestrian traffic;
> 5. Weather conditions and visibility;
> 6. The seriousness of the offense for which the police are pursuing the suspect;
> 7. Whether the officer proceeded with sirens and blue lights;
> 8. Whether the officer had available alternatives which would led to the apprehension of the suspect besides puruit;
> 9. The existence of police policy which prohibits pursuit under the circumstances; and
> 10. The rate of speed of the officer in comparison to the posted speed limit.

Additionally, the City of Ellisville had a Pursuit of Motor Vehicle policy which was admitted into evidence as Exhibit K. The City of Ellisville's Pursuit of Motor Vehicles policy Section 7748-6 enumerates that an officer must ask himself before initiating a fast pursuit such as:

1. Does the seriousness of the crime committed, or being committed, warrant a high speed chase at unsafe speeds?
2. What is the probability of apprehending the fleeing person?
3. Will the pursuit take place on residential streets, in a business district, or on a freeway? What is the danger to other innocent citizens in these areas?
4. What are the traffic and weather conditions?
5. What is the condition of the police cruiser? How are the tires, brakes, steering, etc.?

Therefore, I conclude as a matter of law that the Officer Tolbert's actions on the night in question violated the criteria established in the Johnson Case as well as the pursuit policy established by the City of Ellisville. . . . Evans under the circumstances was in disregard for the safety and well-being of others, including the Plaintiffs, who were lawful using the public highway and were not engaged in criminal activity.

Although reasonable minds might differ on the conclusion of whether or not the officer in question acted in reckless disregard, it is beyond this Court's power to disturb the findings of the trial judge if supported by substantial evidence. *Brister*, 838 So. 2d at 277-78.

¶16. The facts of the case sub judice are analogous to *Brister*, where this Court held that there was substantial evidence to support a finding of reckless disregard. In *Brister*, police pursued an unknown suspect who had been accused of check forgery. *Id.* at 276. The pursuit in *Brister* lasted less than 60 seconds over a distance of less than a mile in a residential area and resulted in the suspect's crash with another vehicle. *Id.* at 279. In *Brister* the trial court based its findings on various factors including that, the chase was contrary to a police department's general order, the officers were engaged in active pursuit up until the collision, the pursuit should have been terminated after the officers realized the suspect would not stop,

7

and that the officers did not properly balance the public's safety versus immediate apprehension of a check forger. *Id.*

¶17. The trial court in the case sub judice considered ten factors as enumerated in *Johnson v. City of Cleveland,* 846 So. 2d 1031 (Miss. 2003), in support of its finding of reckless disregard. The first six factors were enumerated in this Court's majority opinion in *Johnson*, while the last four were contained in the concurring in result only opinion written by Presiding Justice McRae, *Id.* at 1037. It is appropriate for trial courts to consider all ten factors, and to look at the totality of the circumstances when analyzing whether someone acted in reckless disregard. The evidence in this case reveals that the chase lasted for nine-tenths of a mile, occurred at night, in a residential area on a hilly, curvy, two-lane road with medium levels of traffic. The officer traveled this road frequently and had prior knowledge that it was a residential area and continued to pursue Evans after Evans had run oncoming traffic off the road. The officer was not in pursuit of an unknown suspect. In fact, the officer had previous encounters with Evans, knew where Evans lived, knew Evans's mother, and knew that Evans was likely to try to avoid arrest which he did even after colliding with the Richardson's vehicle. Nevertheless Tolbert elected to continue the pursuit while Evans weaved in and out of traffic at excessive speeds and endangered the safety of innocent citizens.

¶18. Evans's outstanding warrants included misdemeanor charges and one charge for assaulting an officer, as a result of Evans's biting Tolbert's hand during Tolbert's last unsuccessful attempt to arrest Evans. Tolbert testified that he did not know if Evans had been charged for a felony or misdemeanor. There was also testimony to establish the fact that the officer proceeded with his sirens and flashing lights up until the time of the accident, that he

8

was driving in excess of the speed limit, and that there were at least four cars between the officer and Evans at the time of the accident. Evans passed approximately six vehicles, including those four, all within a chase that lasted less than one mile, and Tolbert continued the pursuit until the point of impact.

¶19. Furthermore, there was ample evidence to support violations of the City of Ellisville's Pursuit of Motor Vehicles policy. The chase was not the result of a serious crime being committed at the moment. The two vehicles were exceeding the speed limit in a residential neighborhood, in the dark, with a low probability of apprehending the suspect, as he was known to flee and had successfully fled in the past.

¶20. The City of Ellisville's Pursuit of Motor Vehicles Policy requires officers to weigh the seriousness of the offense against the hazards present to innocent citizens who may become involved and to continually ask this question as the chase continues. The policy also requires officers to "immediately terminate a fresh pursuit whenever . . . [the] safety of innocent citizens outweighs the danger to the community if the suspect were not immediately apprehended." This policy was clearly violated, as it was in *Brister*, where this Court found that the officers did not properly balance the public's safety versus immediate apprehension of the suspect. 838 So. 2d at 281.

¶21. This Court in *Brister* found that,

> [t]he circuit judge clearly based his findings on substantial, credible, and reasonable evidence. Applying our appropriate legal standard and recent caselaw, that is all that is necessary. Had a jury tried this case, it could have reasonably found that all of these circumstances establish more than simple negligence. The learned trial judge found by looking at the totality of the circumstances that the officers acted with reckless disregard to public safety. That is exactly what our caselaw requires.

9

*Id.* at 279. Applying this precedent, as this Court is required, there is substantial and credible evidence to support a finding of reckless disregard in the case sub judice. This issue is without merit.

> **II.    Whether the trial court should apportion damages under Miss. Code Ann. § 85-5-7(7).**

¶22.    The City argues that the trial court erred by not apportioning fault. The Richardsons' complaint specifically alleged that Evans acted negligently.

¶23.    Miss. Code Ann. § 85-5-7 (1991) provides in pertinent part:

> (1) As used in this section "fault" means an act or omission of a person which is a proximate cause of injury or death to another person or persons, damages to property, tangible or intangible, or economic injury, including but not limited to negligence, malpractice strict liability, absolute liability or failure to warn.
> . . .
> (7) In actions involving joint tort-feasors, the trier of fact *shall* determine the percentage of fault for each party alleged to be at fault.

(Emphasis added).

¶24.    The City relies on *Brister*, 838 So. 2d 274, where the plaintiff filed a suit against the city and the trial court found that the officer acted in reckless disregard and allocated fifty percent (50%) liability to Slater, the suspect being pursued, and fifty percent (50%) liability to the City of Jackson. This Court affirmed the trial court stating: "We find no abuse of discretion by the trial judge whose ruling is supported by substantial, credible and reasonable evidence." *Id.* at 276.

¶25.    In the case sub judice, Evans was not named as a defendant. However, there was testimony that Evans was the driver of the vehicle that collided with the plaintiffs. The Richardsons also alleged in their complaint that Evans "negligently entered the    southbound

lane of Highway 29, and while so doing, his motor vehicle collided with the motor vehicle driven by the plaintiff, Tammy Richardson, and occupied by the plaintiff, Shana Richardson, a minor, as the passenger." Nevertheless, the trial judge failed to address in his Memorandum Opinion and Judgment or his Judgment denying defendants' motion for reconsideration, that he apportioned fault between the joint tortfeasors as required by Miss. Code Ann. § 85-5-7.

¶26. The Richardsons contend that the City first raised the issue of apportionment on appeal and has, therefore, waived any right to apportionment. However, the Richardsons pled the negligence of Evans in their complaint. Obviously the issue of Evans's negligence was before the court, as the trial judge addressed Evans's negligence in his Memorandum Opinion. Finally, in their Motion to Reconsider before the trial court the City and Officer Tolbert sought relief of the trial court, wherein they stated: "The damages of Plaintiff were charged solely to the Defendant without offset, credit or pro-ration to the negligence of Evans." This Court finds that this plea for relief was sufficient, albeit a poor choice of words, to provide the trial court an opportunity to correct this error. Miss. Code Ann. § 85-5-7 requires the trier of fact to apportion fault.

¶27. Whether there are joint tortfeasors is a question of fact. In the Memorandum Opinion and Judgment, the trial judge found that:

> it was undisputed that (a) Mrs. Richardson was not engaged in the commission of a crime and the time of the collision and was not guilty of negligence which caused or contributed to it and (b) **the that negligence of Joe C. Evans, Jr. in operating his vehicle at an unsafe speed, failing to maintain adequate control over the vehicle and failing to maintain a proper lookout for others was the direct cause of the collision . . .**

11

(Emphasis added). The trial judge later concluded that **Tolbert's "action was the proximate cause of the collision** and of the resulting injuries to Tammy and Shana Richardson as well as the damage to the vehicle of Ronnie Richardson." (Emphasis added).

¶28. The trial court's findings are ambiguous, and this constitutes plain error. See *Selman v. Selman*, 722 So. 2d 547, 554 (Miss. 1998).

¶29. It is unclear from the trial court's memorandum opinion and judgment and judgment overruling the motion to reconsider if either it assessed the plaintiffs' total damages in an amount greater than the judgment, and accordingly reduced the award by a percentage of fault assessed to Evans, or if it determined the total damages suffered by plaintiffs and assessed no percentage of fault to Evans. Therefore, we must reverse and remand to the trial court for a specific finding of the total damages suffered by each plaintiff, and for a specific finding of the respective percentages of fault of Tolbert and Evans, if any, and then direct the trial court to enter final judgment accordingly.

### III. Whether damages were supported by medical proof in terms of probability.

¶30. The City contends that the trial court erred in finding that Tammy's injuries were permanent and this error is reflected in the award of damages to her. It argues that the medical evidence does not support the award and the finding of permanent injury is contrary to the evidence.[1]

---

[1]The City requests that, if this Court finds Tolbert and the City liable, and if the case is not reversed for a new trial, then the damage award should be reduced.

¶31. The Richardsons point out that Dr. Keith Melancon's medical records reflect that Tammy had a grade two lateral ligament complex left ankle sprain. They state that Tammy physically demonstrated to the court the condition of her ankle and testified about continuing problems with the ankle, then three and one-half (3 1/2) years post accident. The defendants provided the court with no testimony to rebut Tammy's contention of injury to her ankle, of indefinite duration.

¶32. Tammy was transported to South Central Regional Medical Center and then to Forrest General Hospital where she was admitted for six days. Tammy was diagnosed with a sprained left ankle, bilateral pulmonary contusions, multiple rib fractures[2] and possible Thoracic 11, Thoracic 12 and Lumbar 1 compression fracture.[3]

¶33. During her hospitalization, Tammy underwent physical therapy and respiratory therapy. Tammy was discharged, with a prescription for Tylox and Valium[4] and went home. But later that same day, she sneezed, causing her to lose her breath, and was taken back to the hospital where she was hospitalized for an additional three days.

¶34. Tammy testified that she underwent physical therapy once a week for six weeks and had two follow-up visits with Dr. Melancon for her ankle while was swolen and painful. Dr. Melancon gave her three injections to her ankle to try to reduce the swelling. Tammy's last visit to Dr. Melancon was in March of 2000.

---

[2]Multiple fractures on the left posteriorly at ribs 6 and 7 and a possible 10th rib fracture on the right.

[3]The age of the possible compression fracture could not be determined.

[4]There was no evidence that she filled a prescription following discharge from the hospital.

13

¶35. Tammy testified how the accident impacted her life. Prior to the accident, she did all the cooking, cleaning and laundry along with gardening and yard work. After the accident, she wore a back brace for approximately a month after being discharged from the hospital. Following being discharged from the hospital, she wasn't able to do anything for herself and Shana and her husband both had to help her bathe and they did all the cooking, cleaning and laundry.

¶36. During February, Tammy was still using the back brace but could bathe herself and take care of herself. It was in March that she started her normal household activities.

¶37. Tammy was in her last semester at Jones County Community College, and her instructors found an old recliner and placed it in the classroom so she wouldn't have to sit up straight. This allowed her to graduate on schedule.

¶38. Following graduation, Tammy was employed by Entel Corporation. Tammy testified her injuries made it difficult to perform her duties:

> If I was on maintenance that night, if I had to so a lot of reaching and stretching over my tools, by the end of the evening, my left side would be sore, my back would be sore. By the end of my shift, my complete shift, my foot and ankle would swollen (sic) so badly that I had to take my shoes off. In fact, I even purchased one size larger and just tied the shoelaces tighter because I knew by the end of the evening, I was going to be filling them up with the swelling.

Tammy worked for Entel for a year and then took medical leave.

¶39. Regarding "lingering effects" from the injuries she sustained in the accident, Tammy testified over three years post accident:

> I still have the swollen ankle, and swollen foot every day if I am standing on my feet. If I've been on my feet doing housework, by the end of the day it is swollen. Then I also get – I call them Charlie horses. Muscle spasms, or whatever you want to call them. If I happen to stretch my left arm out, I get them

on my left side and towards the back. Other than that, it's mostly the ankle that has been the biggest problem.

¶40.   Dr. Kirk Banquer, a general surgeon, was deposed, and his deposition was entered into evidence at the close of the trial. Dr. Banquer first saw Tammy on December 22, 1999, the night of the accident. Dr. Banquer testified regarding Tammy's injuries and her treatment while she was hospitalized, and stated that Tammy had fractured three ribs in the accident, and was complaining primarily of chest pain, lower back pain, and left hip pain. Dr. Banquer opined that, based upon a reasonable degree of medical certainty, there was no future limiting problem or restrictions of physical activities because of her rib fractures. However, he did give her instructions to follow-up with Dr. Melancon for treatment for her ankle and spine fractures.

¶41.   The trial judge stated:

> I further find that Shana Richardson has fully recovered from the injury to her right elbow and shoulder without permanent injury or impairment. Tammy Richardson, however, suffered severe pain from her injuries. She has recovered from the injury to her ribs but continues to have pain and swelling in her ankle which will continue indefinitely and must therefore be considered as a permanent injury.

Tammy testified to the fact that she still had problems with pain and swelling three and a half years after the accident. She testified that a place on her ankle stays swollen and is completely numb. "Any witness is competent to testify who has evidentiary facts within his personal knowledge, gained through any of his senses. A nonprofessional witness may describe personal injuries. Physical pain, weakness, exhaustion and the like are matters one may testify about." *Stratton v. Webb*, 513 So. 2d 587, 590 (Miss. 1987). This Court finds that the testimony of pain and swelling three and a half years after the accident was sufficient to find an injury of indefinite duration. Thus, this issue is without merit.

15

## CONCLUSION

¶42.  This Court finds sufficient evidence to support the trial court's decision that Tolbert acted in reckless disregard.  This Court also finds that there was sufficient medical proof to establish damages.  However, because the trial court erred in failing to apportion fault between Evans and Tolbert, we must reverse and remand to the trial court for a specific finding of the total damages suffered by each plaintiff, and for a specific finding of the respective percentages of fault of Tolbert and Evans, if any, and then for the trial court to enter final judgment accordingly.

¶43.  **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**COBB, P.J., CARLSON AND GRAVES, JJ., CONCUR.  DICKINSON, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY WALLER, P.J. AND EASLEY, J.  SMITH, C.J., AND DIAZ, J., NOT PARTICIPATING.**

**DICKINSON, JUSTICE, DISSENTING:**

¶44.  Because the record does not establish that Officer Tolbert acted in "reckless disregard for the safety" of the public, I respectfully dissent.

I.

¶45.  Article 4, Section 33 of our state constitution grants the Legislature the sole authority to enact substantive law.  When we are called upon to interpret one of those laws, our function and duty is to interpret the wording of the statute so that, as closely as possible, the decision we render does not stray from the *collective* legislative intent behind the statute, which I equate with the plain meaning of the words chosen and agreed by the Legislature as a whole, as

16

opposed to the subjective intent of some particular legislator who might have introduced or argued in favor of the law.

¶46.    In the case before us today, it is not our function to decide, or even contemplate, the circumstances under which a city or a police officer should stand liable for civil damages. The Legislature has decided to grant immunity from civil liability to cities and their police officers acting within the course and scope of their employment or duties, with one exception. That singular exception is not where the officer's actions were negligent, or even grossly negligent. The only circumstance the Legislature allows this Court to affirm a verdict of civil damages against a police officer engaged in police duties is where the officer "acted in *reckless disregard* of the safety and well-being of any person not engaged in criminal activity at the time of injury." Miss. Code Ann. § 11-46-9(1)(c) (Rev. 2002) (emphasis added).

¶47.    Thus, in order to be true to our constitutional mandate of deference to the Legislature, this Court is required to examine the facts to determine whether the trial judge erred in finding that officer Tolbert "acted in reckless disregard of the safety and well-being" of the Public.

II.

¶48.    The term "reckless disregard" now joins that expanding group of terms which seem to expand in scope and meaning over time. There was a time when the term "reckless disregard" was equated by this Court with the level of culpability necessary for depraved heart murder. *See* **Windham v. State**, 602 So. 2d 798, 803 (Miss. 1992). In **Collins v. Tallahatchie County**, 876 So. 2d 284 (Miss. 2004), this Court held that "reckless disregard is a higher standard than gross negligence and 'embraces willful or wanton conduct which requires knowingly and

17

intentionally doing a thing or wrongful act.'" *Id.* at 287, citing *Turner v. City of Ruleville*, 735

So. 2d 226, 230 (Miss. 1999). In *Turner*, we stated:

> While we agree that reckless disregard would encompass gross negligence, we hold that reckless disregard is a higher standard than gross negligence by which to judge the conduct of officers . . . [T]his Court has held that "wanton" and "reckless disregard" are just a step below specific intent.

*Id.* For emphasis, I repeat: *"reckless disregard is a higher standard than gross negligence. . . . 'reckless disregard' [is] just a step below specific intent."* *Id*. (emphasis added).

¶49. Assuming as I do that this Court intends to adhere to the principles of stare decisis and separation of powers (deference to legislative prerogative), the authority cited supra begs the question: Was officer Tolbert's conduct worse than gross negligence, and just a step below specific intent to injure the Richardsons? Was his level of culpability comparable to that required for depraved heart murder?

*Officer Tolbert's conduct*

¶50. Turning to the facts established in the record, we find the following:

(1) While on duty, officer Tolbert spotted Evans who, at the time, had several outstanding arrest warrants including one for assault on a police officer.

(2) When officer Tolbert and the police chief had previously attempted to arrest Evans, he fought off both officers, assaulted one of them, and escaped.

(3) Numerous attempts to arrest Evans had been unsuccessful because Evans's family members were unhelpful to police and Evans would resist arrest, run and hide.

(4) When Officer Tolbert spotted Evans, he called for backup and attempted to make an arrest by turning on his blue lights and sounding his siren and giving pursuit.

(5) Because of past conduct, Officer Tolbert fully expected Evans to stop and "bail out" and try to evade arrest on foot.

(6) The pursuit took place on a state highway with a speed limit of 45 miles per hour. There were no intersections, cross roads, stop signs, or traffic lights on the highway where the pursuit took place.

(7) Officer Tolbert never exceeded the speed limit more than 10 miles per hour, and at the time of the accident (according to the trial judge), he was traveling only 45 miles per hour.

(8) The pursuit lasted less than a mile and approximately one minute.

(9) Officer Tolbert never moved into the southbound lane to pass cars.

(10) Although Officer Tolbert saw Evans pass some cars, there is no evidence in the record of Evans's speed or whether he passed any cars in a no-pass zone. Whatever Evans's speed, it could not have exceeded Officer Tolbert's speed of 55 miles per hour by much, since Evans was only a few car lengths ahead of Officer Tolbert at the time of the accident.

(11) According to the City of Ellisville's policy, the decision to pursue Evans was at Officer Tolbert's discretion.

¶51. This Court has never adopted a test or specific set of factors to be used in determining whether a police officer's conduct amounts to reckless disregard. In *City of Jackson v. Brister*, 838 So. 2d 274 (Miss. 2003), we found "instructive" the following six factors enumerated in *District of Columbia v. Hawkins*, 782 A.2d 293 (D.C. 2001): (1) the length of the chase, (2) type of neighborhood, (3) characteristics of the streets, (4) the presence of vehicular or pedestrian traffic, (5) weather conditions and visibility, and (6) the seriousness of the offense for which the police are pursuing the vehicle. *Brister*, 838 So. 2d at 280.

¶52. In Presiding Justice McRae's concurring in result only opinion in *Johnson v. City of Cleveland*, 846 So. 2d 1031 (Miss. 2003), an additional four factors were considered: (1) whether the officer proceeded with sirens and blue lights, (2) whether the officer had available alternatives which would lead to the apprehension of the suspect besides pursuit, (3) the

existence of police policy which prohibits pursuit under the circumstances, and (4) the rate of speed of the officer in comparison to the posted speed limit. *Id*. at 1037.

¶53.     As authority for his ten factors, Presiding Justice McRae cited *Brister*, 838 So. 2d at 279-80; *City of Jackson v. Lipsey*, 834 So. 2d 687, 692-93 (Miss. 2003); *City of Jackson v. Perry*, 764 So. 2d 373, 377 (Miss. 2000); *Maye v. Pearl River County*, 758 So. 2d 391, 395 (Miss. 1999). *See also District of Columbia v. Hawkins*, 782 A.2d 293 (D.C. 2001).

¶54.     Although all these factors are helpful in cases alleging reckless disregard of a police officer, I would not adopt any specific set of factors but rather continue to view them as instructive.   Against this background, I now examine Officer Tolbert's conduct in the light most consistent with the trial court's decision.

*Officer Tolbert's Conduct*

¶55.     To begin, the trial judge never found Officer Tolbert's conduct in reckless disregard for the safety and well-being of others, as required by Miss. Code Ann. § 11-46-9.   Instead, he stated in his Memorandum Opinion and Judgment: "I conclude as a matter of law that [Officer Tolbert's] pursuit of Evans under the circumstances was *in disregard* for the safety and well being of others." (Emphasis added).   However, the context of the balance of the Memorandum Opinion and Judgment indicates the trial judge probably evaluated the evidence under the correct standard of "reckless disregard."

¶56.     I now examine the facts of the case sub judice, applying all ten of the factors enumerated in *Johnson*.

(1) *the length of the chase*

20

¶57. The accident occurred approximately nine-tenths of a mile from the intersection where Tolbert made the u-turn and began his pursuit. Thus, the pursuit lasted less than two minutes.

¶58. This factor weighs in favor of Officer Tolbert.

(2) *type of neighborhood*

¶59. Bobby Reynolds, a witness to the pursuit, called Highway 29 a "normal Mississippi highway" with houses on both sides of the road. Officer Tolbert confirmed there are "several" houses on both sides of the road, but denied it was densely populated. Although the evidence fairly indicates that the pursuit took place in a "residential" area, it was not a neighborhood or subdivision, but a state highway with a speed limit of 45 miles per hour.

¶60. This factor is neutral.

(3) *characteristics of the streets*

¶61. According to testimony at trial, Highway 29 is a "normal" Mississippi highway with curves and hills. There are no intersecting roads or stop signs.

¶62. This factor is neutral.

(4) *the presence of vehicular or pedestrian traffic*

¶63. The record is devoid of any evidence of pedestrians in the area. Trial testimony indicates that traffic was between light and medium. At the beginning of the pursuit, there were no vehicles between Evans and Officer Tolbert, but as the pursuit continued, Evans passed approximately six vehicles, two of which pulled over to allow Officer Tolbert to pass, leaving four vehicles between Officer Tolbert and Evans at the point of impact.

¶64. This factor weighs against Officer Tolbert.

(5) *weather conditions and visibility*

21

¶65.    There was testimony that it was a cold and clear evening. It was around 7:15 p.m., and it was dark.

¶66.    This factor is neutral.

(6) *the seriousness of the offense for which the police are pursuing the suspect*

¶67.    Evans had numerous outstanding arrest warrants, including one for assaulting a police officer. Additionally, Evans had physically fought officers and evaded arrest on numerous occasions.

¶68.    This factor weighs in favor of Officer Tolbert.

(7) *whether the officer proceeded with sirens and blue lights*

¶69.    There was testimony that Officer Tolbert had his blue lights on and the siren blowing.

¶70.    This factor weighs in favor of Officer Tolbert.

(8) *whether the officer had available alternatives which would lead to the apprehension of the suspect besides pursuit*

¶71.    Officer Tolbert testified that Evans had avoided arrest on several occasions, even resorting to violence. Officer Tolbert believed Evans would stop and "bail out" and attempt to evade arrest on foot. In fact, at trial, Officer Tolbert testified:

Q.   So you knew on December 21, 1999 from your prior experience that Joe Evans, Jr. was going to do whatever he needed to do to avoid arrest, wasn't he?

A.   I believe in my deposition I stated that he would bail out of the vehicle within a couple of blocks and that's what I felt like he was going to do on this occasion.

Q.   But you knew from prior experience that he was going to run. He didn't obey police officer's commands in the past and that he would always try to take off and hide? You knew that, didn't you?

A.   Yes, sir. When he was wanted for something, he did.

22

Q.  And you knew that prior to December 21, 1999?

A.  Yes, sir.

Q.  Okay.  I think you testified in your deposition that – well, let me ask you this. Did you think – how did you plan on stopping him that night?  If you knew he was going to run, how were you going to chase him down in your car and apprehend him?  What were your plans?

A.  As I stated, I felt like that he was going to run a couple of blocks in his vehicle, as he normally does.  He gets out and he runs on foot.  And I was going to do my best to chase him down on foot.

Q.  And you have done that in the past and have never been able to catch him, have you?

A.  He's always been faster.

Q.  Then what in your opinion was different from your prior experience – what was different on December 21, 1999 and your prior experience with him?

A.  It's just my job to do the best to catch him.

¶72.   Officer Tolbert had called for backup.  He could have declined to attempt to stop Evans and instead arrest him at his home with additional officers, but given that Evans's family members would not assist police, and considering Evans's history of violence and escape, the decision to attempt to stop Evans by engaging in a one-mile, two minute pursuit at 45 to 55 miles per hour was not, in my view, unreasonable.

¶73.   This factor weighs in favor of Officer Tolbert.

   (9) *the existence of police policy which prohibits pursuit under the circumstances*

¶74.   The City had in effect the following Pursuit of Motor Vehicles policy:

The seriousness of the possible outcome of a fresh pursuit demand that an officer weigh many factors when deciding whether or not to chase a vehicle in the name of the citizens he serves.  Some of the specific questions an officer must ask himself before initiating a fresh pursuit would include:

1. Does the seriousness of the crime committed, or being committed, warrant a high speed chase at unsafe speeds?

2. What is the probability of apprehending the fleeing person?

3. Will the pursuit take place on residential streets, in a business district, or on a freeway? What is the danger to other innocent citizens in these areas?

4. What are the traffic and weather conditions?

5. What is the condition fo (sic) the police cruiser? How are the tires, brakes, steering, etc.?

\* \* \*

6. Is there another officer in the cruiser with him?

¶75. Furthermore, the policy provides:

In the instance that the chase is initiated, the safety of all concerned must be considered. As previously stated, it is important that the officer weigh the seriousness of the offense against the hazards present to innocent citizens who may become involved. As the chase is continued, this question must be continuously asked.

THE DEPARTMENT EXPECTS AN OFFICER TO IMMEDIATELY TERMINATE A FRESH PURSUIT WHENEVER THE RISH (sic) TO THE POLICE CRUISER, THE VEHICLE BEING PURSUED, OR SAFETY OF INNOCENT CITIZENS OUTWEIGHS THE DANGER TO THE COMMUNITY TO THE SUSPECT WERE NOT IMMEDIATELY APPREHENDED.

¶76. These factors in the City's policy are not substantially different from the factors discussed by this Court.

¶77. This factor weighs in favor of Officer Tolbert.

(10) *the rate of speed of the officer in comparison to the posted speed limit*.

¶78. Officer Tolbert testified that he was driving approximately 55 miles an hour, but had slowed down at the time of impact. The trial court found that Officer Tolbert was traveling 45

miles per hour at the time of the wreck. The posted speed limit was 45 miles an hour. Officer Tolbert never passed cars in order to increase his speed.

¶79. This factor weighs in favor of Officer Tolbert.

¶80. As stated above, the issue in this case is not whether Officer Tolbert was negligent in his two-minute pursuit of Evans. Nor is it whether his decision was grossly negligent. Stated differently, even if Officer Tolbert's decision to pursue Evans, and his other actions, were grossly negligent, the Legislature has provided the city and him immunity from civil liability. We must go beyond gross negligence and find that he acted with reckless disregard for the safety of others. Under the facts of this case, I cannot so find. Therefore, I would reverse and render the circuit court's judgment. For these reasons, I respectfully dissent.

**WALLER, P.J., AND EASLEY, J., JOIN THIS OPINION.**