949 So.2d 69 (2006)
Linda McCOY, Individually and on behalf of the Wrongful Death Beneficiaries of Robin McCoy, deceased and Daniel and Jeweline Lee, Individually and on behalf of the Wrongful Death Beneficiaries of Dana Lee, deceased, Appellants
v.
CITY OF FLORENCE, City of Richland, Rankin County Sheriff's Department and Corey Tate, Appellees.
No. 2005-CA-00803-COA.
Court of Appeals of Mississippi.
July 18, 2006.
Rehearing Denied November 14, 2006.
*72 Drayton D. Berkley, attorney for appellants.
Victoria Hardy Rundlett, Paul Hobart Kimble, B. Stevens Hazard, J. Lawson Hester, Jackson, attorney for appellees.
Before LEE, P.J., GRIFFIS and ROBERTS, JJ.
ROBERTS, J., for the Court.

SUMMARY OF THE CASE
¶ 1. This tragic wrongful death lawsuit arose after Corey Tate, then twenty years old, fled from police in a stolen Lexus. Corey had three passengers with him. Corey's eighteen year old girlfriend, Robin McCoy, rode in the front passenger seat. Robin's cousin, Dana Lee, and Corey's best friend, Steven Bledsoe, rode in the back seat. Robin, Dana, and Steven died as a result of the single-vehicle accident. Corey survived.
¶ 2. Robin's parents and Dana's parents sued Corey for wrongful death. Later, they sued the City of Florence (Florence), the City of Richland (Richland), and Rankin County under the Mississippi Tort Claims Act. After nearly four years and numerous procedural volleys that included two sets of amended pleadings, a change in venue, pretrial motions, discovery, and changes of counsel, the Rankin County Circuit Court awarded summary judgment to all defendants. Aggrieved, the McCoys and Lees appeal.[1] The Appellants claim the circuit court erred when it granted summary judgment because (1) there are genuine issues of material fact as to whether the "government defendants" acted in reckless disregard of Robin and Dana's safety and well-being and (2) Corey Tate did not filed a motion for summary judgment.
¶ 3. After careful review, we find no error in the circuit court's decision to grant summary judgment in favor of Florence, Richland, and Rankin County. However, we find that the circuit court erred when it granted summary judgment for Corey. As such, we reverse and remand the Appellants' wrongful death suit against Corey to the Rankin County Circuit Court for further proceedings.

*73 FACTS
¶ 4. This civil suit for wrongful death began over a stolen car. On February 6, 2001, Mr. Lemoyne Martin, a salesman at Herrin-Gear Lexus in Jackson, Mississippi, prepared a recently sold gold Lexus for delivery. Martin moved the Lexus to the customer pickup area, left the keys in the ignition, exited the Lexus, and left the area to speak to a customer. Before the customer picked up the Lexus and drove it away, Martin saw a young man sit in the Lexus. Martin was not alarmed, but he told the young man that the Lexus had been sold. The young man started the Lexus and drove it away as Martin beat on the passenger side window. Martin contacted the Jackson Police Department and reported the stolen Lexus.
¶ 5. The stolen Lexus appeared the next day in the Florence community of Rankin County, Mississippi. Highway 49, a four-lane divided highway, runs north and south through Florence. At approximately 2:40 p.m. on February 7, 2001, Officer Tim Culpepper of the Florence Police Department drove his patrol car South on Highway 49. Officer Culpepper noticed a new gold Lexus as it traveled north on Highway 49. At that moment, Officer Culpepper did not know the Lexus was stolen. Instead, Officer Culpepper noticed that the driver exceeded the posted speed limit and wove recklessly through the other traffic. Though he did not activate his "blue lights," Officer Culpepper crossed the median of Highway 49 and turned his patrol car around. As he approached the Lexus, Officer Culpepper noticed that it did not have a proper license plate.
¶ 6. Officer Culpepper did not have to stop the Lexus. Instead the driver pulled over on his own. When the Lexus reached the next traffic light, the driver turned right off of Highway 49 and pulled into an Amoco gas station. The driver stopped next to the gas pumps, as if he intended to put fuel in the Lexus. Officer Culpepper followed the Lexus into the Amoco parking lot, parked his patrol car behind the Lexus, and contacted Officer Tracey Hughes, a fellow member of the Florence Police Department.
¶ 7. Officer Hughes arrived shortly and took up what law enforcement officers call "the security position" where one officer stands behind the stopped vehicle and watches the occupants through the rear window. The intent behind such positioning is to provide additional security to the investigating officer. That is, Officer Hughes intended to watch the occupants of the Lexus while Officer Culpepper spoke to the driver.
¶ 8. Officer Culpepper approached the Lexus and, as mentioned, found it occupied by Corey, Robin, Dana, and Steven. Officer Culpepper asked for Corey's driver's license and his vehicle registration. Corey gave Officer Culpepper his driver's license and a document with the Lexus's vehicle identification number. Corey also told Officer Culpepper that the Lexus belonged to his aunt.
¶ 9. Officer Culpepper walked back to his patrol car and contacted the Rankin County Sheriff's Department (RCSD) and requested a NCIC background check of Corey's driver's license and the vehicle identification number. The RCSD could only run one NCIC background check at a time, so it first ran a background check on Corey's driver's license. The NCIC report indicated that Corey's driver's license had been suspended. Officer Culpepper intended to arrest Corey for driving with a suspended driver's license.
¶ 10. Officer Culpepper walked back over to the Lexus and asked Corey to step out of it. Corey locked his door, rolled up his window, and drove away at a high rate of speed. Corey left the gas station, accelerated *74 as he turned north onto Highway 49, and sped away towards Richland, Mississippi. Officers Culpepper and Hughes rushed to their patrol cars so they could follow Corey. As they left the parking lot, the RCSD reported that the NCIC background check on the Lexus's VIN indicated that the Lexus was stolen.
¶ 11. By the time Officers Culpepper and Hughes got back to their patrol cars and began to pursue Corey, he was already between one hundred and one hundred-fifty yards ahead of them. Corey quickly put several hundred yards between himself and the officers. Officer Culpepper realized that he could not keep up with Corey, so he attempted to at least keep him in sight. Officer Hughes followed Officer Culpepper and used the "common band" on his police radio to contact other law enforcement officers. By using the "common band" Officer Hughes was able to reach other members of the Florence Police Department, members of the Richland Police Department, and the RCSD.
¶ 12. Having heard Officer Hughes's radio transmissions, Officer Sandy Adams of the Florence Police Department positioned himself at the intersection of Pearson Road and Highway 49. Officer Adams waited on the right shoulder of Highway 49. Officer Adams intended to perform a "rolling roadblock." That is, Officer Adams planned to pull out when he saw the blue lights top the hill in the distance behind him. He expected to get in front of Corey and cause Corey to slow down. Officer Adams never had an opportunity to perform a rolling roadblock. When he finally saw Officer Culpepper's blue lights crest the hill behind him, Corey went past him "at a high rate of speed." Officer Adams did not pursue Corey.
¶ 13. Meanwhile, as Corey neared Richland, Richland police officers closed off Highway 49. They blocked off any traffic that could have entered the northbound lanes of the highway. They wanted to prevent any additional traffic from entering the highway to minimize the risk to other drivers. Officer Rodney Eriksen of the Richland Police Department was at the intersection of Highway 49 and Scarborough Street in Richland. According to Officer Eriksen, Corey drove so fast through that intersection that he looked like a "blur" and a "flash" as he went by. Corey lost control near that intersection. Officer Eriksen did not see the cause of Corey's loss of control. Officer Eriksen stated that "[t]he only thing [he] saw . . . [he] saw that flash and then [he] saw some debris, some dirt fly up in the air. Then [he] heard several officers saying at the same time that there had been an accident." Officer Eriksen said that Officers Culpepper and Hughes were between one hundred and one hundred-fifty yards behind Corey when Corey reached the intersection of Highway 49 and Scarborough Street. Neither Officer Culpepper nor Officer Hughes saw Corey lose control because they were too far away from him. Officer Adams did not see Corey lose control either. He could barely see Officers Culpepper and Hughes in the distance. Robin, Dana, and Steven all died when they were ejected from the Lexus as it flipped. As mentioned, Corey survived.
¶ 14. On August 24, 2001, Corey pled guilty to three counts of manslaughter. Judge Samac Richardson sentenced Corey to serve concurrent twenty year sentences for counts one and three. As for count two, Judge Richardson sentenced Corey to a consecutive twenty year sentence and then suspended that sentence and placed Corey on five years supervised probation.

PROCEDURAL HISTORY
¶ 15. Robin's parents, Larry and Linda McCoy, and Dana's parents, Daniel and *75 Jewelene Lee, retained attorneys Isaac Byrd and Katrina Gibbs. On July 2, 2001, they filed a complaint against Corey in the First Judicial District of the Hinds County Circuit Court. By way of their complaint, they requested fifty million dollars in compensatory damages and fifty million dollars in punitive damages.

A. The Appellants Amend Their Complaint.
¶ 16. On December 17, 2001, the Appellants amended their complaint and added Florence, Richland, Officer Culpepper, Officer Hughes, and Officer Adams as defendants. According to their first amended complaint, Officer Culpepper negligently instituted a high speed chase and "negligently and/or intentionally" pursued Corey outside Florence's jurisdictional limits. The Appellants also claimed that the newly named defendants acted in "reckless disregard . . . for the rights of Robin."
¶ 17. Further, the Appellants alleged that Florence and Richland (a) failed to train police officers to operate their vehicles in a safe and proper manner, (b) failed to properly and adequately train police officers to determine whether a high speed chase is appropriate, and (c) failed to properly and adequately train police officers in the proper techniques involved in conducting a high speed chase. The Appellants did not deviate from their one hundred million dollar damages request. The Appellants later amended their complaint again and added the RCSD, the State of Mississippi, and the Pearl Police Department as defendants.

B. Florence and Richland Achieve a Change of Venue.
¶ 18. On January 25, 2002, Florence and Richland filed a motion to change venue from the Hinds County Circuit Court to the Rankin County Circuit Court. On May 16, 2002, the Hinds County Circuit Court sustained Florence and Richland's motion and transferred venue to the Rankin County Circuit Court.

C. Steve Hemingway III Attempts to Join the Lawsuit.
¶ 19. Meanwhile, Steven's father, Steve Hemingway III, attempted to take part in the pending litigation. On May 3, 2002, Hemingway filed a wrongful death claim on Steven's behalf. Though he was represented by different counsel, Hemingway's complaint was a near mirror image of the Appellants' first amended complaint. Hemingway requested twenty-five million dollars in compensatory damages and twenty-five million dollars in punitive damages. On May 13, 2002, Hemingway filed a motion to join as a plaintiff or consolidate his lawsuit with the Appellants'. However, the circuit court denied Hemingway's motion to consolidate because the statute of limitations under the Mississippi Torts Claim Act (MCTA) had expired.

D. The Appellants' Subsequent Attempts to Amend their Complaint.
¶ 20. On February 11, 2003, the Appellants filed their third motion for leave to amend their complaint. They sought to amend their complaint and add a "42 U.S.C. § 1983" cause of action. On June 12, 2003, the Appellants filed their fourth motion for leave to amend their complaint. This time, they sought to add a "28 U.S.C. § 1983" cause of action. It appears that the Appellants' third and fourth motions for leave to amend their complaint went unresolved because on February 10, 2004, the Appellants filed their fifth motion for leave to amend their complaint. Again, they sought to add a "42 USC § 1983" cause of action. We can find no document among the nearly two-thousand page record that in any way disposed of the Appellants' third, fourth, or fifth motions to amend. Based on the record, there is no *76 indication that the Appellants ever added the disputed "42 U.S.C. § 1983" cause of action they requested.

E. Katrina Gibbs Withdraws as Counsel for the Appellants.
¶ 21. On August 5, 2004, Katrina Gibbs withdrew as counsel for the Appellants. However, another member of Isaac Byrd's firm substituted as counsel. Attorney Ottawa Carter took over for Gibbs. On October 22, 2004, Ottawa Carter and the entire firm of Byrd, Gibbs & Martin, PLLC, withdrew as counsel for the Appellants. At that point, the Appellants were without representation entirely.

F. Affidavits from Corey and from Robin's Former Roommate.
¶ 22. On November 4, 2004, Corey Tate submitted a sworn affidavit. By his affidavit, Corey swore:
On the evening before her death, Robin McCoy, Steven Bledsoe, Markel Henderson and I went to Harrah's Casino in Vicksburg. On that night, Robin McCoy drove the four door champagne colored Lexus that was involved in the accident in which Robin McCoy was killed, although she knew said Lexus was stolen.
On February 7, 2001, Robin McCoy, Dana Lee, Steven Bledsoe and I were traveling northbound on Highway 49 when a police officer began to follow the Lexus.
I pulled over at an Amoco gas station and a police car pulled up behind the Lexus. After I gave the police officer my driver's license and a certificate from inside the dash, Robin told me, "you need to go."
When I did not leave the gas station parking lot, Robin continued to urge me to "just go." When the police officer came back to the car, Robin McCoy was encouraging me to leave the premises and I complied with her request. Dana Lee and Steven Bledsoe were also indicating that they did not want to go to jail and were both asking me to drive away.
Robin McCoy wanted me to make a turn at the McLaurin school; however, I did not know the area very well, so I decided to try to make it to Jackson, where I could lose the police.
On November 17, 2004, Jamella Files, Robin's roommate at Jackson State, submitted a sworn affidavit. According to Jamella's affidavit, "[o]n the day before the accident, I saw Robin McCoy drive a four door champagne colored Lexus into the parking lot of the dorm. Robin was alone in the vehicle when I saw her."

G. The Defendants File Motions for Summary Judgment.
¶ 23. September 21, 2004, Rankin County filed a motion for summary judgment. On December 16, 2004, Florence, Pearl, and Richland filed motions for summary judgment. Officer Culpepper filed his motion for summary judgment on January 11, 2005. At that point, all named defendants except Corey and the State of Mississippi had filed motions for summary judgment.

H. Drayton Berkley Enters His Appearance.
¶ 24. In the meantime, the Appellants found a new attorney. On December 22, 2004, Drayton D. Berkley of the Cochran firm in Memphis, Tennessee entered his appearance. On January 21, 2005, the Appellants responded to the defendants' motions for summary judgment.

I. The Circuit Court Grants the Defendants' Motions for Summary Judgment.
¶ 25. On January 24, 2005, the circuit court conducted a hearing on the defendants' motions for summary judgment. *77 Prior to argument on the merits, Mr. Berkley stipulated to dismiss the Appellants' claims against all defendants except Florence, Richland, and Rankin County because Mr. Berkley felt that the Appellants had no claim against the other defendants. Accordingly, the circuit court entered a judgment and dismissed, with prejudice, the Appellants' claims against Pearl, Officer Culpepper, Officer Hughes, and Officer Adams. Ultimately, the circuit court granted summary judgment in favor of the remaining defendants. On March 21, 2005, the Rankin County Circuit Court entered its judgment. As such, the circuit court dismissed the Appellants' complaint with prejudice.
¶ 26. On April 6, 2005, the Appellants filed their notice of appeal. We turn to their substantive arguments. However, we are mindful of the appropriate standard of review involved.

STANDARD OF REVIEW
¶ 27. This Court conducts a de novo review of a trial court's decision to grant a motion for summary judgment. Branch v. State Farm Fire and Casualty Co., 759 So.2d 430(¶ 6) (Miss.2000). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact." M.R.C.P. 56(c). Not only that, we must view those sources in the light most favorable to the non-moving party. Baldwin v. Holliman, 913 So.2d 400(¶ 17) (Miss.Ct.App.2005).
¶ 28. In the context of a motion for summary judgment, a fact is "material" if it tends to resolve any of the issues properly raised by the parties. Id. at (¶ 18). A mere allegation by the non-moving party that a dispute over whether a material fact exists will not defeat a movant's otherwise properly supported motion for summary judgment. Id. This Court will affirm the trial court's decision to grant a motion for summary judgment if we find, beyond a reasonable doubt, that the non-moving party would not be able to prove any facts to support his claim. Id.

ANALYSIS
I. WHETHER THE CIRCUIT COURT ERRED WHEN IT GRANTED SUMMARY JUDGMENT FOR FLORENCE, RICHLAND, AND RANKIN COUNTY.
¶ 29. The Appellants claim that the circuit court erred when it granted summary judgment in favor of Florence, Richland, and Rankin County. According to the Appellants, summary judgment was inappropriate because genuine issues of material fact exist regarding whether Florence, Richland, and Rankin County acted in reckless disregard of Robin and Dana's safety and well-being.
¶ 30. "The Mississippi Tort Claims Act . . . provides the exclusive remedy against a governmental entity and its employees for acts or omissions which give rise to a suit." Estate of Williams v. City of Jackson, 844 So.2d 1161(¶ 9) (Miss. 2003). Florence, Richland, and Rankin County are immune to liability for the acts of law enforcement officers in their employ unless those law enforcement officers acted in reckless disregard of the safety and well-being of Robin and Dana. See Miss Code Ann. § 11-46-9(1)(c). Not only that, when the alleged tortious act involves police protection, a governmental entity "has two avenues of immunity: (1) if the decedent was engaged in criminal activity, then the [governmental entity] is immune, and (2) if the decedent was not engaged in criminal activity, and if the [governmental entity's] employees did not act with reckless disregard, then the [governmental entity] *78 is immune." Estate of Williams, 844 So.2d at (¶ 11).
¶ 31. In City of Jackson v. Brister, 838 So.2d 274 (Miss.2003), the Mississippi Supreme Court affirmed a circuit court's decision, incident to a bench trial, that officers of the Jackson Police Department acted in reckless disregard of the safety and well-being of a third-party motorist killed during a vehicle pursuit of an attempted forgery suspect. Id. at (¶ 23). Brister enumerated six factors indicative of reckless disregard. Id. at (¶ 22). As will be shown, the six Brister factors evolved into ten factors. However, before we turn to an analysis of the factors enumerated in Brister and its progeny, we must first determine whether there exists a genuine issue of material fact regarding whether the individual governmental entities were involved in a pursuit of Corey.

A. Pursuit

1. Florence
¶ 32. The Appellants submit that there exists a genuine issue of material fact regarding whether Florence pursued Corey. The Appellants' entire argument consists of the statement that "Culpepper clearly admitted that he never terminated the pursuit." That statement is somewhat of a mischaracterization of Officer Culpepper's deposition testimony. During his deposition, the Appellants' attorney asked Officer Culpepper seven times to admit that he never terminated his pursuit of Corey. When Officer Culpepper would not respond to the Appellants' attorney's liking, she would ask the same question again. According to Officer Culpepper, he was not engaged in pursuit of Corey in that he expected to overtake and apprehend Corey. Rather, Officer Culpepper's deposition testimony indicated that he followed Corey so as to report Corey's whereabouts, to report if Corey left Highway 49, and to request emergency assistance if and when Corey injured himself or others. After numerous repeated questions, Officer Culpepper finally agreed with the Appellants' attorney.
¶ 33. There is no evidence that Officer Culpepper was ever any closer than one hundred to one hundred-fifty yards behind Corey. There is no direct evidence that Corey felt as though Officer Culpepper actually pursued him or not. Regardless, there is no dispute that Officer Culpepper operated the patrol car that was the first one "in line" behind Corey during Corey's flight. Additionally, there is no dispute that Officer Culpepper operated his "blue lights" and his siren during Corey's flight. Since we are mandated to consider the evidence in the light most favorable to the non-moving party, we must assume that Officer Culpepper pursued Corey. Baldwin, 913 So.2d at (¶ 17). As such, we find it appropriate to examine whether Florence acted in reckless disregard of Robin and Dana's safety and well-being.

2. Richland
¶ 34. The Appellants claim that "Officer Culpepper and Officer Hughes testified that the City of Richland was involved in the pursuit." That is not accurate. Officer Culpepper stated that, "Richland . . . cut off the intersections" to Highway 49. Officer Culpepper did not say that any member of the Richland Police Department was involved in the pursuit. According to Officer Hughes:
Once we entered Richland, a Richland officer pulled out and the suspect vehicle passed him and he told us on the radio to come on by. I'm sure he fell in behind us. I didn't look back to see. Richland had blocked off the intersection at Scarborough. When I say blocked off, they had blocked it off from any incoming traffic from either way. In other words, *79 they was opening the road up for the pursuit to proceed through.
There is no other evidence regarding Richland's involvement in the pursuit. That Richland police officers prevented traffic from entering Highway 49 is not involvement in a pursuit. At best, they were bystanders. Accordingly, we find that Richland was not involved in pursuit of Corey. "A mere allegation by the non-moving party that a dispute over whether a material fact exists will not defeat a movant's otherwise properly supported motion for summary judgment." Baldwin, 913 So.2d at (¶ 18). As such, we will not include Richland in our examination of the factors enumerated based on the evolution of Brister.

3. Rankin County
¶ 35. The Appellants suggest that Rankin County was involved in the pursuit. Their entire argument is the statement that, "Officer Erikson testified that Rankin County, Mississippi was involved in the pursuit." Officer Erikson's deposition indicates otherwise. During Officer Erikson's deposition, the Appellants' attorney asked Officer Erikson who followed Corey. Officer Erikson responded, "[m]ainly Florence, and I believe there was [a unit from the RCSD], but like I say, I was concerned with getting around those parked cars." (emphasis added). Officer Erikson also stated that a RCSD unit was "involved" at the crash site. The Appellants' attorney asked Officer Erikson whether Rankin County and Florence were "working together in a pursuit." Officer Erikson answered, "I'm sure they were, yes, sir." Further, Officer Erikson said that, to the best of his knowledge, Florence and maybe one unit from Rankin County were involved in the pursuit.
¶ 36. Officer Erikson confirmed that his report said units from Rankin County joined the pursuit. He also elaborated. According to Officer Erikson, his report was accurate because, "when [he] pulled out onto Highway 49 and waited for all of the units to go by, there were some Rankin S.O. units there also, but [he didn't] know how far behind." He further stated that "[he] had no idea, because [he] waited for everybody to go who was in an emergency vehicle." (emphasis added). Officer Erikson also noted that the first time he knew of any involvement by the RCSD was when cars came through the intersection after Corey had already lost control of his vehicle. Finally, Officer Erikson said, "[t]he only thing [he knew was] that [the RCSD] showed up at the scene after [Corey lost control]". Officer Erikson's deposition testimony indicates that he thought units from Rankin County were involved in the pursuit because they showed up at the scene of the accident after-the-fact.
¶ 37. Even in the light most favorable to the Appellants, Officer Erikson's deposition testimony merely shows that he speculated on Rankin County's involvement because he saw Rankin County units after Corey lost control. Officer Erikson presented no definitive testimony of Rankin County's participation in the pursuit. "To create a genuine issue of material fact, the evidence must be significantly probative." Estate of Williams, 844 So.2d at (¶ 13). The Appellants' only proof of a genuine issue of material fact is Officer Erikson's speculation. That scant testimony certainly does not rise to the level of "significantly probative."
¶ 38. Officer Culpepper was Corey's primary "pursuer." Officer Culpepper testified that RCSD was not involved in the pursuit. According to Officer Culpepper, RCSD "may have arrived later, but as far as being involved, no, they were not." Officer Culpepper also said that he "saw *80 absolutely no Rankin County Sheriff cars in this pursuit." Officer Hughes corroborated Officer Culpepper. Officer Hughes stated, "I know that when we arrived on the crash scene that Rankin County was not present and did not show up until a later time." Further, Officer Hughes said that there were no units from Rankin County behind him because he did not see them and no unit from Rankin County notified him that they were behind him an act that is standard procedure. We find no significantly probative evidence of a genuine issue of material fact regarding Rankin County's participation in the pursuit. As such, we will not analyze Rankin County's participation for reckless disregard.

B. Reckless Disregard
¶ 39. The "reckless disregard" standard encompasses willful and wanton action, which signifies "knowingly and intentionally" committing a wrongful act. Titus v. Williams, 844 So.2d 459(¶ 38) (Miss.2003). While stopping short of requiring intentional conduct, it embodies "conscious indifference to consequences, amounting almost to a willingness that harm should follow." Id.
¶ 40. In the context of a police pursuit, reckless disregard is determined by examining numerous factors. As mentioned, Brister was the first case to enumerate those factors. In Brister, the supreme court found District of Columbia v. Hawkins, 782 A.2d 293 (D.C.Ct.App.2001) instructive and listed six factors appropriate for an examination as to whether an officer's conduct during a police pursuit amounted to reckless disregard. Brister, 838 So.2d at (¶ 22). Three months later, the supreme court handed down Johnson v. City of Cleveland, 846 So.2d 1031 (Miss.2003). In Johnson, the supreme court reversed a circuit court's decision to grant summary judgment in favor of a police department where genuine issues of material fact existed as to whether an officer operated his blue lights during his response and how fast he drove during that response. Id. at (¶ 12). That officer hit a pedestrian at a time when he was not actually involved in pursuit of a vehicle. Id. at (¶ 3). Justice McRae concurred with a separate opinion and listed the six Brister factors as well as four additional factors not mentioned in Brister. Id. at (¶ 19). According to Justice McRae's concurring opinion, those ten factors "support a finding of reckless disregard in connection with police pursuits." Id.
¶ 41. The supreme court adopted those ten factors in Ellisville v. Richardson, 913 So.2d 973 (Miss.2005) and stated that "[i]t is appropriate to consider all ten factors, and to look at the totality of the circumstances when analyzing whether someone acted in reckless disregard." Id. at (¶ 17). Here, we are not analyzing whether someone acted in reckless disregard; we are analyzing whether there are genuine issues of material fact whether someone acted in reckless disregard.
¶ 42. In any event, the ten factors enumerated in Richardson are:
1. The length of the chase;
2. Type of neighborhood;
3. Characteristics of the streets;
4. The presence of vehicular or pedestrian traffic;
5. Weather conditions and visibility;
6. The seriousness of the offense for which the police are pursuing the suspect;
7. Whether the officer proceeded with sirens and blue lights;
8. Whether the officer had available alternatives which would lead to the apprehension of the suspect besides pursuit;

*81 9. The existence of police policy which prohibits pursuit under the circumstances; and
10. The rate of speed of the officer in comparison to the posted speed limit.
Id. at (¶ 15).
¶ 43. The Appellants claim:
the Trial Court erred in failing to analyze the facts before it under the Brister/Richardson framework to determine if there was an issue of fact to be tried as to whether the pursuing officers acted with reckless disregard. Applying the Brister/Richardson framework would indicate that the pursuing officers acted with reckless disregard. The pursuit lasted over a distance of five (5) miles. The pursuit proceeded North on Highway 49 in spotty traffic until Corey Tate lost control at a roadblocked intersection. Culpepper initiated the pursuit because Tate was driving with a suspended license. This was clearly a technical violation under the City of Florence's pursuit policy. Officer Culpepper admitted that he never terminated the pursuit. Officer Culpepper never disengaged his emergency lights or his siren. Officer Culpepper already had Tate's driver's license. The pursuit traveled at speeds of one hundred ten to one hundred fifteen miles per hour. Officer Culpepper never slowed down. Culpepper confirmed that Tate's driving constituted a danger to other motorists and to Tate's passengers. Under these circumstances, the City of Florence's pursuit policy mandated that this pursuit should have been terminated.
¶ 44. First, the Appellants either intentionally or accidentally misstate certain facts. Corey did not lose control of the Lexus at a "roadblocked" intersection. There was no roadblock set up across Highway 49. Rather, members of the Richland Police Department prevented traffic from entering Highway 49. Additionally, Officer Culpepper did not initiate pursuit over a mere suspended license. Instead, he initiated pursuit because of Corey's suspended license, his previous reckless driving, Corey's blatant refusal to obey his order to exit the vehicle, Corey's flight from the scene, and the fact that Corey operated a reported stolen Lexus. With those mischaracterizations cleared up, we turn to our analysis of the ten relevant factors.

1. Length
¶ 45. Length could suggest either duration or distance. The undisputed testimony indicated that Corey's flight lasted for a matter of minutes over a distance of five miles. Nothing in this factor indicates reckless disregard.

2. Neighborhood
¶ 46. Corey's flight took place on Highway 49, a fourlane highway divided by a median. It was not on a residential street or within a residential neighborhood. Again, nothing indicates reckless disregard of Robin and Dana's safety and well-being.

3. Characteristics of the Streets
¶ 47. There is little to no testimony regarding the characteristics of the streets on which the flight took place. There is certainly nothing that could indicate reckless disregard.

4. Traffic
¶ 48. All testimony indicates that traffic was light, at most. Again, we find no genuine issue of material fact demonstrative of reckless disregard.

5. Weather
¶ 49. The weather was sunny and clear. We could certainly find reckless disregard in a situation involving diminished visibility or wet conditions. Here, that is not the case. We find no genuine issue of material *82 fact regarding the presence of reckless disregard.

6. Seriousness of Corey's Offense
¶ 50. Corey was operating a stolen vehicle with a suspended license. Officer Culpepper first noticed Corey because of Corey's excessive speed and reckless driving. Corey disobeyed Officer Culpepper's instruction to exit the Lexus. When Corey fled, unprovoked, Corey quickly accelerated to speeds in excess of one-hundred miles per hour. Corey presented a serious life-threatening risk to himself, his passengers, and all other motorists and pedestrians. We find no genuine issue of material fact indicative of reckless disregard on behalf of Florence.

7. Sirens and Blue Lights
¶ 51. Officer Culpepper's deposition testimony unequivocally indicates that he had his sirens on and his blue lights. We can find no issue of reckless disregard under this factor.

8. Alternative Means of Apprehension
¶ 52. Officer Culpepper had Corey's driver's license in his possession. However, Officer Culpepper testified that he did not have an opportunity to compare the picture on the driver's license to the actual driver. Officer Culpepper further testified that, based on his training, an officer who speaks to a driver should stand slightly behind the driver's window because it is harder for a driver to harm an officer in that position and, at the same time, the officer can see the driver's hands early enough to detect a weapon. Officer Culpepper was also concerned that Corey gave him someone else's driver's license because of Corey's false statement that the Lexus belonged to his aunt and the fact that Corey operated a stolen car. Accordingly, there is no genuine issue of material fact that Officer Culpepper believed he had no alternative means to apprehend Corey. We find no reckless disregard under this factor.

9. Policy
¶ 53. Under this factor we must consider whether Florence's policy prohibited pursuit under the circumstances. Florence's written policy stated that "[o]fficers involved in pursuit must continually question whether the seriousness of the violation reasonably warrants continuation of the pursuit." Further, the policy instructed that "[a] pursuit shall be discontinued when there is a clear danger to the pursuing officer or the public. The pursuit officer must consider present danger, seriousness of the crime, length of pursuit, and the possibility of identifying the suspect at a later time when determining whether or not to continue the pursuit." Accordingly, the policy seems to follow many of the same factors under Richardson. While it is not appropriate to reexamine those factors, we can certainly say that nothing in Florence's policy prohibited Officer Culpepper's pursuit. Thus we find no reckless disregard.

10. Speed
¶ 54. Officer Culpepper testified that he reached a speed of somewhere between one hundred and one hundred-fifteen miles per hour. Officer Culpepper also testified that Corey was never any closer than one hundred to one hundred-fifty yards away. Further, Officer Culpepper had a difficult time merely keeping Corey within sight: In his affidavit, Corey swore that he was on his way to Jackson, Mississippi, where he hoped to evade authorities in an area with which he was more familiar. Corey lost control of his stolen vehicle through no action of Officer Culpepper. The Appellants seem to argue that Officer Culpepper somehow provoked Corey's speed and therefore contributed to his loss of control. The undisputed proof shows that Corey fled the gas station unprovoked and proceeded *83 in a life-threatening manner. That Officer Culpepper exceeded the posted speed limit in effort to merely maintain sight of Corey is in no way indicative of reckless disregard.
¶ 55. Having examined all ten factors under Richardson, we can find no one factor in which a genuine issue of material fact as to whether Officer Culpepper acted in reckless disregard of Robin and Dana's safety and well-being. Finding not one factor, we can certainly not find reckless disregard when considering the totality of the circumstances. Accordingly, we find no error in the circuit court's decision to grant summary judgment in favor of Florence.
II. WHETHER ROBIN AND DANA WERE INVOLVED IN CRIMINAL ACTIVITY AT THE TIME OF THE ACCIDENT.
¶ 56. There is a second and equally compelling and viable reason why summary judgment for the governmental defendants is appropriate. When the alleged tortious act involves police protection, a governmental entity is immune if the decedent was engaged in criminal activity. Estate of Williams, 844 So.2d at (¶ 11). "In order for recovery from a governmental entity to be barred because of the victim's criminal activity, the criminal activity has to have some causal nexus to the wrongdoing of the tortfeasor." Id. at (¶ 15). "This is because the statute was not designed to protect grossly negligent or intentional tortfeasors from liability where the fact that the victim is engaged in a criminal activity is merely fortuitous and has no relation to the transaction out of which liability would otherwise arise." Id. (citations and internal quotations omitted).
¶ 57. Regretfully, the evidence is without contradiction that Robin and Dana were engaged in criminal activity. During Corey's guilty plea and sentencing hearing, Judge Samac Richardson of the Rankin County Circuit Court asked Corey whether Steven, Dana, and Robin knew that the Lexus was stolen. Corey told Judge Richardson that Robin brought the car to him and that he did not know where Robin acquired it. Corey said he did not question Robin's possession of the Lexus because he thought her family "was kind of like well off." Jamella Files's sworn affidavit indicated that she saw Robin alone in the stolen Lexus the night before Robin died. There is no dispute that Robin and Dana were aware that the Lexus was stolen.
¶ 58. With that guilty knowledge, Robin and Dana encouraged, if not pled with Corey to flee from Officer Culpepper. According to Corey's sworn affidavit, Robin, Dana, and Steven all encouraged him to flee the scene because they feared the consequences of being in a stolen vehicle. Corey gave a similar statement during interrogation. Corey later told Officer Hughes that Dana and Steven kicked his seat and urged him to flee the scene because they did not want to go to jail. Officer Hughes corroborated Corey's statement when he testified that he noticed that Dana and Steven moved in the backseat when Officer Culpepper approached the Lexus to arrest Corey. The criminal activity in which Robin and Dana were engaged was not "merely fortuitous." Robin and Dana's encouragement to flee amounts to a direct causal nexus of Corey's illegal flight.
¶ 59. A person who aids, assists, or encourages another to commit a crime is as guilty as the principal. Griffin v. State, 242 Miss. 376, 380-82, 135 So.2d 198, 199-200 (1961). Griffin is factually somewhat similar to the present case. In Griffin, the supreme court affirmed a conviction *84 for manslaughter where the defendant encouraged his sixteen year old son to evade police pursuit. Id. at 382, 135 So.2d at 200. A car chase ensued and the defendant's son crashed into a vehicle driven by a third party. Id. at 379, 135 So.2d at 199. That third party died shortly after the accident. Id. The supreme court found that, because the defendant encouraged his son to evade the police, the defendant was as guilty as the principal, his son. Id. What is more, Robin and Dana's conduct implicated additional criminal statutes. Pursuant to Miss.Code Ann. § 97-35-7(2) (Rev.2000), "[a]ny person who causes, or aids, or encourages, or abets another to violate . . . any provision of subsection (1) . . . shall be guilty of disorderly conduct." According to Section 97-35-7(1)(i):
[w]hoever, with intent to provoke a breach of the peace, or under such circumstances as may lead to a breach of the peace, fails or refuses to promptly comply with or obey a request, command, or order of a law enforcement officer, having the authority to then and there arrest any person for a violation of the law, to . . . act or do or refrain from acting or doing as ordered, requested or commanded by said officer to avoid any breach of the peace at or near the place of issuance of such order . . . shall be guilty of disorderly conduct.
By his affidavit, Corey swore that Robin knew the Lexus was stolen. Corey also swore that after Officer Culpepper approached him at the gas station, Robin told him, "you need to go." When Corey did not leave, "Robin continued to urge [him] to `just go.'" Officer Culpepper intended to arrest Corey for driving with a suspended license. When Officer Culpepper requested that Corey step out of the Lexus, Robin again encouraged Corey to flee. Corey also swore that Dana knew that the Lexus was stolen, that she indicated that she did not want to go to jail, and that she asked him to drive away. As mentioned, Dana kicked Corey's seat and pled with him to leave. Officer Hughes saw Dana moving in the backseat. Once Corey left the gas station, Robin encouraged him to turn so as to evade the authorities. Instead, Corey tried to make it to Jackson because he was more familiar with the area. To be sure, we do not find that Robin and Dana were, in fact, guilty of committing a crime. However, the MTCA does not require an actual finding of guilt. Pursuant to the MTCA,
A governmental entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim . . . Arising out of any act or omission of an employee of a governmental entity engaged in the performance or execution of duties or activities relating to police or fire protection unless the employee acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of injury.
Miss.Code Ann. § 11-46-9(1)(c) (Rev. 2002). With due sympathy for Robin and Dana's families, we must find that there is no genuine issue of material fact regarding whether Robin and Dana were "engaged in criminal activity" at the time they died. As such, the governmental entities are immune from the Appellants' suit.
III. WHETHER THE CIRCUIT COURT ERRED WHEN IT GRANTED SUMMARY JUDGMENT IN FAVOR OF COREY TATE.
¶ 60. In the final "issue," the appellants argue that the circuit court erred when it granted summary judgment in favor of all defendants because Corey did not file a motion for summary judgment. We agree. The record indicates that Corey was personally served with a summons and a complaint *85 on July 31, 2001. Corey never filed an answer nor made an appearance. Similarly, he never filed a motion for summary judgment. As such, we reverse the judgment of the circuit court and remand this matter as it applies to Corey only.
IV. WHETHER THIS COURT SHOULD SANCTION THE APPELLANTS FOR A FRIVOLOUS APPEAL.
¶ 61. Rankin County submits that this Court should levy sanctions against the Appellants and their attorney because their appeal is frivolous. The Litigation Accountability Act of 1988 instructs us to exercise our sound discretion in considering such a request. Miss.Code Ann. § 11-55-7 (Rev.2002). According to M.R.A.P. 38, if we determine that an appeal is frivolous, we "shall award just damages and single or double costs to the appellee." "This Court has evaluated Rule 38 frivolity by reference to M.R.C.P. 11." Roussel v. Hutton, 638 So.2d 1305, 1318 (Miss.1994). An appeal is frivolous when, objectively speaking, the appellant has no hope of success. E.g., Little v. Collier, 759 So.2d 454(¶ 20) (Miss.Ct.App.2000).
¶ 62. Here, we can objectively find that the Appellants had no hope of success against Rankin County. Drayton Berkley, the Appellants' attorney, was retained after his clients faced multiple motions for summary judgment. Mr. Berkley had the volume of proof before him. He was aware of the evidence against his clients as it applied to Rankin County. On appeal, Mr. Berkley had the entire two-thousand page record to review. Despite having this voluminous record, the Appellants were only able to construct a one-sentence blurb for an argument. The Appellants' entire argument was the statement, "Officer Erikson testified that Rankin County, Mississippi was involved in the pursuit." The only evidence they had in support of that allegation was a speculative statement from someone with no direct knowledge upon which to base his statement. Even then, the Appellants presented no argument or evidence to support a necessary finding of reckless disregard. Further, the Appellants had no hope of success because the undisputed facts among the record show that Robin and Dana were involved in criminal activity at the time of their death.
¶ 63. "Frivolous filings impose substantial and unnecessary costs upon both litigants and the courts, and ultimately upon the public." Id. This is especially true in this instance, as it is the people of Rankin County who ultimately would have had to bear the expense of defending against the Appellants' frivolous appeal. In light of our finding of frivolity, we award, in favor of Rankin County and against the Appellants and their counsel of record, jointly and severally, those attorney's fees incurred in defending this action on appeal. Therefore, we direct that within thirty (30) days after the date of this opinion, counsel for Rankin County submit to this Court and counsel opposite an affidavit delineating his actual attorney's fees charged to Rankin County associated with his appeal to our Court. Counsel opposite will have thirty (30) days from the receipt of that affidavit to respond. Afterwards, we will enter an order awarding attorney's fees in the appropriate amount.
¶ 64. THE JUDGMENT OF THE RANKIN COUNTY CIRCUIT COURT OF SUMMARY JUDGMENT IN FAVOR OF THE CITY OF RICHLAND, THE CITY OF FLORENCE, AND RANKIN COUNTY IS AFFIRMED. THE JUDGMENT OF THE RANKIN COUNTY CIRCUIT COURT OF SUMMARY JUDGMENT IN FAVOR OF COREY TATE IS REVERSED. RANKIN *86 COUNTY IS INSTRUCTED TO FILE WITH THE CLERK OF THIS COURT WITHIN THIRTY (30) DAYS OF THE DATE OF THIS OPINION AN AFFIDAVIT SETTING OUT ANY AND ALL ATTORNEY'S FEES INCURRED AS A RESULT OF THE APPEAL OF THIS CAUSE, AND TO SUBMIT A COPY OF THE AFFIDAVIT TO COUNSEL OPPOSITE. THE APPELLANTS WILL THEN HAVE THIRTY (30) DAYS FROM ITS RECEIPT OF THE AFFIDAVIT OF RANKIN COUNTY TO RESPOND. THE COURT OF APPEALS WILL THEN MAKE A DECISION AS TO THE AMOUNT OF THE AWARD OF ATTORNEY'S FEES TO RANKIN COUNTY. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
LEE AND MYERS, P.JJ., SOUTHWICK, CHANDLER, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR. KING, C.J., AND IRVING, J., CONCUR IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.
NOTES
[1] We prefer to use parties' proper names. Thus, we generally refrain from using general terms such as "Appellants" for parties. However, based on the tedious nature of using "the McCoys and the Lees," we find the use of "Appellants" to be acceptable under the circumstances.