IRVING, J.,
Dissenting:
¶ 31. The majority finds that this case should be affirmed. Respectfully, I must disagree and, therefore, dissent. I believe that this case should be remanded for a new trial and a proper determination of whether Brown acted in reckless disregard as he pursued the Gileses and a proper determination of whether Brown’s actions caused or contributed to the accident in question. I would also reverse and render that part of the circuit court’s opinion finding that Antonio and Roberto Giles were engaged in criminal activity.
¶ 32. During the trial of this case on remand, Brown called Jerry Barrett as an expert witness in the field of police pursuit practices. Barrett insisted throughout his testimony that he was not an accident reconstructionist; however, he testified to the cause of the accident, how it happened, and who was at fault. Brown also testified about his recollection of the events in question. In the circuit court’s opinion, the court made it clear that it was relying heavily on Barrett’s conclusions in rendering its opinion. It is clear from the record that Barrett was not qualified to testify as an accident reconstructionist. I believe that it is also clear that the court improperly devalued the testimony of Amber Wil-cher and Suzanne Sharpe. For those reasons, I would reverse and remand for a new trial without Barrett’s improper testimony and with the testimonies of Wilcher and Sharpe given their full consideration.
ANALYSIS AND DISCUSSION OF THE ISSUES

1. Criminal Activity by Roberto or Antonio

¶ 33. Although the majority does not discuss this issue at all, I find it necessary to address the circuit court’s conclusion on remand that Antonio and Roberto were engaged in criminal activity that had a *1242 direct causal nexus with the accident. If Antonio and Roberto were engaged in criminal activity, then I would have to join the majority in this case in affirming the court below, since their recovery would be barred under the Mississippi Tort Claims Act (MTCA). However, I find that the court erred in finding that Antonio and Roberto engaged in criminal activity. Therefore, I do not believe that their actions bar their recovery under the Act.
¶ 34. As we explained in Giles I, the children must have been involved in criminal activity that bore a direct causal nexus to the accident in order to bar their recovery under the MTCA. Specifically, we explained: “Under [Mississippi Code Annotated section] 11 — 46—9(l)(c), Brown has immunity from liability unless he acted with reckless disregard ... when the Gileses were not engaged in criminal activity.... [T]he ‘criminal activity’ contemplated by the statute must have ‘some causal nexus to the wrongdoing of the tortfeasor.’ ” Giles I, 962 So.2d at 615(1111) (citations omitted).
¶ 35. In Giles I, this Court stated unequivocally that Roberto and Antonio were not barred from recovery simply because they rode the ATV on the highway or because they did not have helmets on:
Unlike them father, Giles’s children were neither charged with, nor convicted of, any crime. While they both admitted that they knew it was against the law for them to be riding the ATV on the highway and riding without their helmets on, we find that this does not rise to the level of criminal activity contemplated by the statute. Unlike them father, the children could not have been charged with reckless driving, as they were not driving, nor could the children have been charged with driving with a suspended license. Therefore, the “criminal activity” limitation would not be sufficient to dismiss the children’s case at summary judgment.
Id. at 616(¶ 14).
¶ 36. It appears that there are no statutes explicitly prohibiting the use of an ATV on a highway; however, Mississippi Code Annotated section 63-7-7 (Rev.2004), which pertains to the operation of a vehicle, states:
It is a misdemeanor for any person to drive or move or for the owner to cause or knowingly permit to be driven or moved on any highway any vehicle ... which is in such unsafe condition as to endanger any person, or which does not contain those parts or is not at all times equipped with such lamps and other equipment in proper condition and adjustment as required in this chapter, or which is equipped in any manner in violation of this chapter....
(Emphasis added). Of course, the clear language of the statute prohibits the driving and operation of improperly-equipped vehicles, which the ATV in this case admittedly was. However, nothing in the statute criminalizes the actions of mere passengers on such a vehicle. I find nothing in the record to indicate that Roberto and Antonio were anything more than mere passengers on the ATV. I can find no statute that criminalizes their actions as passengers on the ATV.
¶ 37. After examining the Mississippi Code, I can also find no provision that requires the wearing of a helmet while operating an ATV or four-wheeler. Mississippi Code Annotated section 63-7-64 (Rev.2004) requires that motorcyclists and operators of motor scooters wear helmets, but I have found no corresponding provision for operators or passengers of ATVs.
*1243 ¶ 38. Regardless of this Court’s ruling in Giles I, the circuit court found on remand that Roberto and Antonio had engaged in criminal activity: “The Court has already found there to have been criminal conduct on the part of Antonio and Roberto by willingly joining their father to ride on the ATV, notwithstanding their relatively young age.” The circuit court cited McCoy v. City of Florence, 949 So.2d 69 (Miss.Ct.App.2006) as support for its conclusion.
¶ 39. Having studied McCoy, I must respectfully disagree with the conclusion reached by the circuit court. In McCoy, this Court found that recovery was barred for two plaintiffs who had actively encouraged another individual to flee from the police. Id. at 84(¶ 59). In so finding, we noted that “[a] person who aids, assists, or encourages another to commit a crime is as guilty as the principal.” Id. at 83(¶ 59) (citing Griffin v. State, 242 Miss. 376, 380-82, 135 So.2d 198, 199-200 (1961)). There is no indication in the record before us that Antonio or Roberto aided, assisted, or otherwise encouraged their father to engage in criminal activity. By all accounts, Roberto and Antonio were simply riding on the back of the ATV. There is no evidence that they told them father to drive the ATV or that they encouraged him to continue driving it at any point. In fact, when questioned as to how he ended up riding the four-wheeler that day, Antonio stated, “My dad told us to get on it, and we would ride to the chicken house.” Roberto testified that his father asked Roberto and Antonio if they wanted to ride on the ATV, and that they responded in the affirmative. Giles himself testified that he “told ’em we were going to ride up by the chicken house.”
¶ 40. I also believe that the circuit court further erred when it found that the mere riding of the ATV constituted a causal nexus to the accident. The circuit court’s reasoning appeared to be that this Court had found that Giles’s conduct bore a causal nexus to the accident, and that that conclusion necessitated a finding that Roberto’s and Antonio’s conduct also had a causal nexus to the incident. I disagree.
¶ 41. Accepting arguendo that riding on the ATV constitutes criminal activity, I have found no evidence in the record to suggest how Antonio and Roberto’s riding of the ATV had a causal nexus to the accident in question. As already discussed, even the statute that prohibits the operation of an ATV on the highway criminalizes only the operation or driving of such a vehicle, not merely being a passenger on an ATV. I simply cannot fathom how the decision of two minor children to ride on the back of an ATV after being told or invited to do so by their father would constitute criminal activity with a causal nexus to the accident in this case.
¶ 42. Consequently, I believe that this Court should reverse and render that portion of the circuit court’s decision finding that Antonio and Roberto engaged in criminal activity sufficient to bar recovery by them under the MTCA. On remand, I would limit the court to two issues: whether Brown acted in reckless disregard for the safety of Antonio and Roberto and whether Brown caused or contributed to the accident, inasmuch as we clearly found in Giles I that riding on the ATV without a helmet was insufficient to bar recovery by Antonio and Roberto.

2. Allowance of Expert Testimony

¶ 43. As the majority notes, the Gileses argue that the circuit court erred in allowing Barrett to testify as a police pursuit *1244 expert. However, they further argue that Barrett gave numerous opinions based upon accident reconstruction, such as how the accident happened, whose fault the accident was, and whether Brown’s behavior amounted to a reckless disregard for the safety and well-being of the Gileses. Accordingly, the Gileses argue that Barrett exceeded his scope of expertise. Unfortunately, the majority declines to address this second argument by the Gileses, with which I firmly agree.
¶ 44. An appellate court applies “an abuse-of-discretion standard of review when reviewing [a] trial court’s decision to allow or disallow evidence, including expert testimony.” Bullock v. Lott, 964 So.2d 1119, 1128(¶ 25) (Miss.2007) (citing Webb v. Braswell, 930 So.2d 387, 396-97(¶ 15) (Miss.2006)). A trial court’s decision to allow expert testimony will be affirmed “unless we can safely say that the trial court abused its judicial discretion in allowing or disallowing evidence so as to prejudice a party in a civil case, or the accused in a criminal case.” Id. (citing Jones v. State, 918 So.2d 1220, 1223 (Miss.2005)).
¶ 45. During the trial, Barrett was deemed an expert in police pursuit and allowed to testify as to whether Brown pursued the Gileses with reckless disregard.[6] However, the circuit court allowed Barrett to opine about certain aspects of the accident that only an accident recon-structionist could have made. The following are examples of Barrett delving into the realm of accident reconstruction:
[BARRETT]: This courtroom is not but 54 feet long. I mean, from that wall to that wall. So I want you to get a-just an idea of how big a distance that is. And so 115 feet, and the reason I know that is because, this is a crude method of doing it, but I stepped outside and I counted those twelve inch squares all the way up and down that hallway. This courtroom is 40 feet wide. So I’m just trying to relate the massive amount of distance that [the Gileses] had to make this turn. And that’s why I say that he overcompensated that turn, and he turned late, and shot right in front of Robert Broiun.
Now, if there was contact, the only damage to Robert Brown’s vehicle, according to the Highway Patrol Report, was a scuff mark on his right front bumper. So if there was contact, he could have contacted either the right back or the left back wheel, fee, and it would have done the same thing as far as the motion of the four-wheeler.
By Amber Wilcher’s deposition, they were only maybe 5 — the vehicles were about 5 feet from her vehicle, to the left side of it. That’s very close. But now she also says that Robert Brown, in his vehicle, hit her vehicle. But that’s virtually impossible, because there’s no damage to his vehicle. That’s by the Highway Patrol Repox-t.
Now, to kind of give you a view of contact at 5 feet, which it actually *1245 could have been a little further than that. I don’t think it would have been any closer, because if it had been, they would have been sandwiched between the car, which they were, and Robert told me that, and it’s in his deposition also, that he thought that the four-wheeler might have bounced off some part of his vehicle, which more than likely would have been around the wheel well, and probably would not have shown any damage. So if the — if there was contact with the right front bumper of his vehicle, to the left or right rear, it would have spun the four-wheeler around to the left side. I don’t know if they made a complete spin or not, I mean, I wasn’t there, so I can’t say. But by the report, the damage to the four-wheeler was on the front end of it, and the four-wheeler hit Amber Wilcher on the left front fender, according to the Highway Patrol Report.
Now, there’s a little discrepancy on that report as far as where the vehicles wound up. I think that, in my opinion, there again, when that contact was made, either to this — -this right back wheel or left back wheel, the four-wheeler would gone around the same way. If it made a complete turn, then the front end of it hit her car, it might have, as he went by, bounced back and hit him in the right — right back wheel area, and he was shot right by ’em.
[PLAINTIFFS’ ATTORNEY]: And Your Honor, I’m just going to — I’m still making my objection as to that being an accident — to the reconstruction’s field, as to giving these opinions of what he thinks happened in there, and I’m objective on that [sic] — still on that same ground.
[THE COURT]: Mr. Barrett, let me query you, question you on this point-—
[BARRETT]: Yes, sir.
[THE COURT]: As to what you’re talking about right now. We’re at the juncture of [Highway] 488 and Laurel Hill Road. Does this smack of accident reconstruction, or are you still in the realm of pursuit?
[BARRETT]: I’m in the realm of the pursuit, and why the contact, the accident took place, in my opinion, and also I want to give you a little more about the height of that vehicle and try to explain why — how the vehicles wound up where they did and—
[THE COURT]: Objection’s overruled.
[[Image here]]
[PLAINTIFFS’ ATTORNEY]: And when [Sharpe] made the statement, on page 11, and when you say so close, do you have an estimate as to the distance between the ATV and the car that you were in? No. Let me back up to — all right, did you read where she said it was a very hard impact?
[BARRETT]: Yes, sir, I did.
[PLAINTIFFS’ ATTORNEY]: And did she not say numerous times it was such a hard impact that the car actually went airborne?
[BARRETT]: Well, the car wasn’t airborne, because it went off of an embankment down into a ditch, a lower area.
[PLAINTIFFS’ ATTORNEY]: But she didn’t say that, did she?
[BARRETT]: Well, no, I mean, but any reasonable person could see that by looking at the documentation into [sic] evidence here.
*1246 [PLAINTIFFS’ ATTORNEY]: Did she not say that it went airborne when it hit the four-wheeler[ ]?
[BARRETT]: It couldn’t have gone airborne when it hit the four-wheeler, because it was still on the road. It’s a distance from that — where the point of impact would have had to take place, to where they would have run off the—
:j: :¡: ⅝ ⅝ * *
[PLAINTIFFS’ ATTORNEY]: But it— stopped to get — [the Gileses] got run over. What could be more dangerous than what—
[BARRETT]: Well, they got run over because they turned, in front of [Brown]. And he wasn’t expecting ’em to turn.
[[Image here]]
[PLAINTIFFS’ ATTORNEY]: So my question, let me use my witness’s theory. And you ask me, and you tell me what your opinion would be. If Robert Brown is following this four-wheeler, and the other vehicle with the children on it, the ATV, gets over in this left lane where there’s oncoming traffic, why would Robert try blocking him from coming across?
[BARRETT]: I don’t see that he did try to block him. I see that they ran across the road in front of him unexpectedly. And there was a car sitting in the intersection, and I see by the drawings and the discrepancies in the testimonies of the Giles[es] that he obviously overshot the intersection and tried to turn at the last second. Now, that’s my opinion, and that’s where I’m basing that on these depositions and the drawings.
[[Image here]]
[PLAINTIFFS’ ATTORNEY]: Do you have any way to figure the speed of the vehicle coming down the road, and the speed of the vehicle over to the— the four-wheeler, and to determine if they were going to hit at the right spot under your theory?
[BARRETT]: In my opinion, no sir, I don’t have. And nobody else would have, either. Because there are no skid marks there to judge anything from. But Mr. Brown’s vehicle is a— was a Chevrolet Lumina, which has ABS brakes, which does—
[THE COURT]: We’re getting into accident reconstruction, is that an accident reconstruction question—
[BARRETT]: Well, not necessarily, sir, I’m just—
[THE COURT]: Go ahead.
[BARRETT]: The only way you can judge things like that is to have some kind of marks. His vehicle would not leave skid marks because it’s a General Motors product, which all have the ABS braking system on them, which means they will not skid the tires. There could not be any skid marks.
(Emphasis added).
¶ 46. During trial, Barrett stated that there was no set way to determine how fast an officer should travel or how closely an officer should follow a vehicle in a police pursuit. This is illustrated in the following colloquy:
[PLAINTIFFS’ ATTORNEY]: Let me ask you, in your officer’s pursuit manual, or whatever you have, what would be your theory if you saw that four-wheeler going down the road, knowing that probably the only violation you’ve got is a suspended driver’s license, *1247 and they’re riding an ATV on a highway, and the kids are on it — -now, we’re not talking about a murder, and we’re talking about considering the safety of those two little boys on the back, what does your manual provide for how far you’re suppose to stay behind them, stay back?
[BARRETT]: There is no — there is no laid out situation as far as how you should — how far you should stay behind anybody. In this whole situation was because Robert Brown, by these depositions, by his deposition, was trying to keep these people from being hurt, and for possibly being killed and get ’em off the road. They were breaking the law. They were on a vehicle without helmets, with no inspection sticker, with no tag, and the father had suspended driver’s license, which is a moot point here. The main thing is, that in my opinion, and there again, I base it on these depositions of what he had to say, is what he was trying to get the people to pull over for their own safety.
⅜ ⅜ ⅜ i¡: ⅜ ⅜
[PLAINTIFFS’ ATTORNEY]: I don’t know. I’m going to try to ask him about the distance, how far he’s suppose to stay behind, and he is the expert in police pursuit, and I haven’t — I need an answer on that.
[THE COURT]: Answer him on that, and then move to the next issue.
[BARRETT]: There is no given policy on the distance that you need to be behind a vehicle at a slow speed pursuit. Now, what I normally tell people, in a slow speed pursuit, is to stay — -judge by where the vehicles are, and try to give ’em, you know, a good distance.
Now, it’s hard, in a pursuit situation, and especially with the excitement and all that, and sometimes people get a little overzealous and get too close. I’m not saying that happened here. This vehicle being off the side of the road on the shoulder, by testimony of a witness, and this one being in the shoulder — the center of the road, does not put ’em close together. It puts ’em far apart.
¶ 47. Although Barrett stated that Giles caused the accident by “[running] across the road in front of [Brown] unexpectedly,” he admitted he was not an accident reconstruction expert:
[PLAINTIFFS’ ATTORNEY]: All right. In police pursuit, in that area that you’re in, they do not train you to determine who is at fault in an accident, do they?
[BARRETT]: Not me, no, sir.
[PLAINTIFFS’ ATTORNEY]: And you haven’t had any training for that purpose?
[BARRETT]: No, sir. I’ve already stated that numerous times throughout this—
(Emphasis added).
¶ 48. Barrett’s testimony should have been strictly confined to the question of whether or not Brown acted in reckless disregard in his pursuit of the Gileses. Instead, Barrett testified at some length as to the cause of the accident and who was at fault, despite his repeated statements during the trial that he was not an accident reconstructionist. Therefore, I believe that the circuit court abused its judicial discretion in allowing Barrett to *1248 testify in the area of accident reconstruction. Given the court’s reliance on Barrett’s conclusions in its judgment, I believe that these unqualified and improper opinions were crucial to the court’s reasoning. Regardless of the majority’s lengthy explanation of Barrett’s qualifications as a police pursuit expert, I believe this case must be reversed and remanded. Like the majority, I find no error in Barrett’s qualification as a police pursuit expert. However, as the above excerpts clearly show, Barrett’s testimony went well beyond the scope of police pursuit and crossed numerous times into the realm of accident reconstruction. By Barrett’s own admissions, he was not qualified to render accident reconstruction opinions. Therefore, I would reverse and remand.

3. Appropriateness of the Grant of Summary Judgment

¶ 49. In arguing that the circuit court erred in ruling in favor of Brown and the Board, the Gileses heavily rely on Sharpe’s deposition testimony, wherein she stated that Brown followed the Gileses’ four-wheeler at a close distance of four inches, as well as on the testimony of Wilcher, who stated that the distance between Brown and the four-wheeler was about a foot wide. The Gileses argue that Brown knew exactly what he was doing by closely following the four-wheeler closely and that he intentionally was driving within such a close proximity in an attempt to stop them or run into them.
¶ 50. As the majority notes, the circuit court in this case is entitled to a highly deferential standard of review from this Court. Regardless, I find that the court abused its discretion, and I would reverse and remand on this issue as well.
¶ 51. In its original judgment, the circuit court gave the following assessment of the witnesses’ testimonies:
Within this spectrum the [cjourt had to weigh the self-serving testimony of Robert, Antonio, and Roberto against Brown’s sworn testimony. Clearly Constable Brown was on the scene that day acting in the scope of his duties in response to a radio call that there was an ATV violation. Posited against that was the conduct of Robert Giles, driving his ATV on a public highway without a driver’s license and driving in a reckless manner, again noting he later pled guilty to both charges. In addition, Robert was exposing his two minor sons to this unlawful activity although they both generally admitted to knowledge of being a part of illegal activity.
Addressing the testimony of Sharpe and Wilcher, as the [cjourt has already commented[,j these women were testifying to an event which occurred approximately five (5) years earlier. There was nothing remarkable about their testimony which would generally dispute the testimony of Brown, except perhaps them remarks about distance, that is, the estimated number of feet between the front of Brown’s vehicle and the back of the ATV. In isolation you have both women testifying in terms of “only four inches,” attributed to Sharpe, and “about a foot,” attributed to Wilcher. However, on balance and in context, evaluating their testimony as a whole, the [cjourt concludes that these seemingly short distances were not the distances testified to immediately prior to the collision. In fact, Amber Wilcher testified to a distance of about twenty (20) feet between Brown and Robert as they approached the intersection.... Also, the [cjourt recognizes that most women are not expected to be knoiol-edgeable about detailed distances due to their lack of expedience in life sitúa- *1249 tions, and Sharpe’s and Wilcher’s general demeanor seemed to confirm stick lack of knotoledge to correctly estimate distances. Finally, even if Brown was very close behind Robert (which would be logical in hot pursuit) this would have only limited relevancy because this “close distance” was arguable at points other than the point of collision, and thus did not proximately contribute to the cause of the accident.
(Emphasis added).
¶ 52. Thereafter, the circuit judge replaced this judgment with an amended judgment stating that “these women are not expected to be knowledgeable about detailed distances.In my opinion, this attempt by the lower court to correct its error is insufficient. Still missing is any explanation of ivhy the circuit judge concluded that Wilcher and Sharpe were unable to estimate distances properly. It is clear to me that the circuit court failed to articulate any logical reason for discounting Sharpe’s and Wilcher’s testimonies. In my opinion, no witness’s testimony should be discounted simply on the basis of his or her gender. Despite the court’s attempt to obfuscate the reason behind its discounting of Sharpe’s and Wilcher’s testimonies, I believe it is clear from the court’s failure to articulate any reason as to why Sharpe and Wilcher could not estimate distances that the court improperly disregarded the testimonies because they were given by two women. In my opinion, credibility determinations on the basis of gender are an abuse of a trial court’s discretion in judging testimony. Due to the crucial importance of Wilcher’s and Sharpe’s testimonies, I believe that the judge’s treatment of their testimonies requires a remand of this case.
¶ 53. The court further found that “the cause of the accident was the sudden, sharp, right hand turn by Robert Giles.” In my opinion, it is contradictory to accept that the accident was caused by Giles suddenly turning in front of Brown and at the same time discount Wilcher’s and Sharpe’s testimonies that Brown was following the four-wheeler closely. Furthermore, the finding that the accident was caused by Giles suddenly turning in front of Brown is based on Barrett’s testimony, which went beyond his expertise.
¶ 54. Even if Barrett had been qualified to testify as he did in this case, I would still find his testimony severely lacking. There is ample law in this State regarding what constitutes reckless disregard in the context of police pursuit. In City of Ellisville v. Richardson, 913 So.2d 973 (Miss.2005), the Mississippi Supreme Court approved a list of ten factors that should be utilized in determining whether the police have acted with reckless disregard in pursuing a suspect: (1) the length of the chase, (2) what type of neighborhood the chase took place in, (3) what type of streets the chase took place on, (4) whether vehicular or pedestrian traffic was present at the time of the chase, (5) visibility and weather conditions, (6) the severity of the offense that triggered the pursuit, (7) whether the officer had engaged his siren and lights, (8) whether the officer could have done something else in order to apprehend the suspect, (9) whether the police policy in effect at the time of the pursuit would have prohibited the pursuit, and (10) the rate of speed of the officer in comparison to the posted speed limit. Id. at 977(¶ 15).
¶ 55. Barrett failed to address the factors that our supreme court has stated are to be considered in determining whether a police pursuit was conducted with reckless disregard. The closest that Barrett came *1250 to addressing factor six, the seriousness of the offense that initiated the pursuit, was his testimony that “[t]he second, major thing that I wanted to know about was, the reason for [Brown] attempting to stop this four-wheeler.... And he immediately told me that there was [sic] three people on that four-wheeler on a highway, and for them own safety, he was trying to get ’em stopped.” In fact, during cross-examination, the Gileses’ attorney asked the following question:
Let me ask you, in your officer’s pursuit manual, or whatever you have, what would be your theory if you saw that four-wheeler going down the road, knowing that probably the only violation you’ve got is a suspended driver’s license, and they’re riding an ATV on a highway, and the kids are on it — now, we’re not talking about a bank robbery, we’re not talking about a murder, and we’re talking about considering the safety of those two little boys on the back, what does your manual provide for how far you’re suppose [sic] to stay behind them, stay back?
(Emphasis added). Barrett’s answer, in my opinion, reveals his lack of knowledge about the factors that are to be considered in these cases, as shown by the following:
There is no — there is no laid out situation as far as how you should — how far you should stay behind anybody. In this whole situation [sic] was because Robert Brown, by his deposition, was trying to keep these people from being hurt, and for [sic] possibly being killed and get ’em off the road. They were breaking the law. They were on a vehicle without helmets, with no inspection sticker, with no tag, and the father had suspended driver’s license [sic], which is a moot point here. The main thing is, that in my opinion, and there again, I base it on these depositions of what he had to say, is what he was trying to get the people to .pull over for their own safety [sic].
Clearly, this question was the perfect opportunity for Barrett to address the factors, especially factor six. Instead, Barrett’s response confirmed the truth of the situation, which was that Giles had committed a few misdemeanors. The trial court similarly declined to address the fact that this pursuit was initiated after Brown observed Giles committing mere misdemeanors. I believe that a proper analysis in this case would find that factor six weighs strongly in favor of a finding of reckless disregard on Brown’s part, as Giles’s crimes were far from severe.
¶ 56. In fact, the court declined to address many of these factors. The length of the chase was discussed only briefly in testimony, and neither Barrett nor the court discussed it when finding that Bi'own acted properly in pursuing the Gileses. Since the pursuit occurred in a rural area of Mississippi, the type of neighborhood, factor two, appears to weigh in favor of Brown, as noted by the trial court. The streets that the Gileses and Brown rode on were not discussed at any length, although there was video footage from the highway and some photographs. Still, neither Barrett nor the trial court discussed the characteristics of the streets. The only testimony concerning traffic indicated that there was very little; as such, the trial court properly noted that this factor weighed in Brown’s favor. Similarly, the court properly found that factor five, weather conditions and visibility, indicated that the weather was clear, and that this factor did not weigh in favor of a finding of reckless disregard. Factor six, the severi *1251 ty of the crime that started the pursuit, has already been discussed. Factor seven addresses whether pursuit is conducted with the siren and lights engaged. There was conflicting testimony on this account; however, neither Barrett nor the trial court discussed the significance of the siren or lights as they relate to a finding of reckless disregard. Factor eight suggests that an officer should consider whether he has other ways of finding a suspect besides pursuit. Giles testified that he knew Brown, that Brown had served subpoenas at his house before, and that Giles’s family had gone to school with members of Brown’s family. Giles firmly believed that Brown knew where he lived. Brown testified that he knew Giles and where he lived, but that he did not realize that it was Giles that he had pulled over until they had the accident. I do not know what the court concluded from all this testimony, because the court’s judgment did not discuss this factor in any way. Given the relevance of this factor to the facts before us, I believe that the court should have addressed this factor as well. There is no testimony regarding factor nine; I assume that there was no relevant police policy and that this factor is moot. Finally, there was no discussion of whether Brown was exceeding the posted speed limit in his pursuit of Giles. Given that the highest speed estimated for the pursuit was around forty-five miles per hour, I find it unlikely that Brown exceeded the speed limit during his pursuit.
¶ 57. When asked by Brown’s attorney whether Brown acted with reckless disregard, Barrett stated: “In my opinion, I don’t find any reckless disregard on Constable Brown’s behalf. I don’t find any gross negligence. I don’t find any malicious act on his part, as far as him trying to intentionally run over these people, on this four-wheeler.” I cannot help but question how Barrett was able to arrive at this conclusion without being aware of the factors that are required to be considered before any such determination can be made. Furthermore, I must ask the same question with regard to the circuit court’s conclusions, as the circuit court did not address many of these factors in rendering its judgment. Although a few of the factors weighed somewhat in favor of the court’s judgment, several crucial factors were not addressed by the court at all. Therefore, I must respectfully dissent. I believe this case should be remanded for a new trial without improper testimony by Barrett. And I believe that, on remand, the circuit court needs to look at the factors that have been expounded by the Mississippi Supreme Court before making any determination as to whether Brown acted with reckless disregard.
¶ 58. In sum, I believe that the court improperly refused to consider the testimonies of Sharpe and Wilcher due to their gender. Further, the court allowed Barrett to testify at length on matters that he was unqualified to testify about. I would remand and ask the court to make a proper determination regarding the cause of the accident, whether Brown contributed to causing the accident, and whether Brown acted with reckless disregard during his pursuit of the Gileses. I would order that such a determination be made without consideration of Barrett’s testimony that the accident was caused by Giles making a wide turn to the left and a sudden turn to the right in front of Brown and without consideration of any other opinions offered by Barrett that were outside his expertise, as I believe that this testimony could only properly be given by an accident reconstructionist. Furthermore, given the circuit court’s view of the *1252 inherent fallibility of females to properly judge distance, I question whether recusal might be proper on remand, as Sharpe and Wilcher are two critical fact witnesses who happen to be female. In making a determination as to whether Brown acted with reckless disregard, I would order that the circuit court consider the factors that have been approved by our supreme court.
LEE, P.J., AND BARNES, J., JOIN THIS OPINION.

. Under Mississippi Code Annotated sec-tionll-46-9(l)(c) (Supp.2008):
A governmental entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim ... (ajrising out of any act or omission of an employee of a governmental entity engaged in (he performance or execution of duties or activities relating to police or fire protection unless the employee acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of injury [.] (Emphasis added).